Sarah Sims GARRETT et al., Plaintiffs,

v.

CITY OF HAMTRAMCK, a municipal
corporation, et al., Defendants.

Civ. A. No. 32004.

United States District Court,
E. D. Michigan, S. D.

Nov. 22, 1971.

Edward C. King, Detroit, Mich., for plaintiff.

Robert A. Rosenberg, Asst. U. S. Atty., Detroit, Mich., for HUD.

Edward C. Torcellini, Hamtramck, Mich., and James F. Nowicki, Mount Clemens, Mich., for defendant, City of Hamtramck.

## MEMORANDUM OPINION AND ORDER

KEITH, District Judge.

Plaintiffs along with their Amici Curiae, Michigan Legal Services Assistance Program and Legal Aid Office-Legal Aid and Defender Association of Detroit, properly bring this action as a class under F.R.Civ.P. 23(b) (2) representing those Black citizens of the City of Hamtramck who have been or are scheduled to be displaced or substantially affected by urban renewal projects which have been previously implemented or which are presently planned by the defendant City. Plaintiffs contend that the City of Hamtramck and its mayor, its co-ordinator of urban renewal and its City Planning Commission have intentionally

planned and implemented urban renewal and other government projects for the purpose of removing a substantial portion of Black citizens from the City. Plaintiffs also contend that the United States Department of Housing and Urban Development has knowingly failed to remedy the above enumerated wrongs and has failed and refused to utilize the available administrative relief which would serve to protect plaintiffs' rights. Plaintiffs assert that these enumerated acts by defendant City of Hamtramck, through its officials, and the failure to act by defendant Department of Housing and Urban Development through its Secretary and officials constitute a violation of their rights under Title 6 of the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000d), under Title 8 of the Civil Rights Act of 1968 (42 U.S.C. § 3608(d) (5)), under § 105(c) and § 105 (f) of the Housing Act of 1949 (42 U.S. C. § 1455(c) and § 1455(f)) under the Michigan Blighted Area Rehabilitation Act M.C.L.A. § 125.74(a), as amended, and the Michigan Act relative to housing for persons displaced for urban renewal, M.C.L.A. § 125.961 and § 125.962, as amended. Such violations, it is alleged, amount to a deprivation of due process of law and equal protection of the laws as guaranteed plaintiffs by the Thirteenth and Fourteenth Amendments to the United States Constitution.

There appears to be no dispute between the parties that the city of Hamtramck, Michigan is located entirely within the boundaries of the city of Detroit, Michigan, and has a population of approximately 26,400 according to the 1967 school census. Beginning as early as 1962, federal funds were made available to Hamtramck to finance the planning of an urban renewal project. In September of 1964 the first loan and capital grant contract was executed by defendant City and the then Housing and Home Finance Administration,[1] to assist the City in accomplishing a selective clearance and rehabilitation project. Two subsequent amendatory contracts served merely to increase the amount of the original loan. The third amendatory contract, however, not only increased the amount of the loan but also enlarged the project area and changed its nature to permit overall clearance, redevelopment and rehabilitation. To accomplish such renewal, the newest plan called for demolition of many low and moderate income dwelling units so as to permit construction of a city hall complex, commercial areas, senior citizens housing units, and single family residences.

Prior to the execution of this third amendatory contract in October of 1968, public hearings were held in the defendant City and objections were voiced. Despite these objections, the City adopted the proposed amended plans, whereupon complaints were then made directly to the Department of Housing and Urban Development charging defendant City with violation of citizen participation requirements, with improper relocation facilities and procedures, with "Negro removal" practices, and with numerous other deficiencies in the urban renewal program. An investigation was conducted by the Department of Housing and Urban Development to determine the accuracy of these complaints; however, on October 15, 1968, the third amendatory contract was executed between the City of Hamtramck and the Department of Housing and Urban Development.

### FINDINGS OF FACT

With this undisputed background information, and having heard this matter in court for approximately three weeks, the court now proceeds to make certain findings from the evidence presented to it. One major problem in the city of Hamtramck is and has been a shortage of low-income housing. During recent years, Hamtramck, and in fact the entire Detroit area, has had a vacancy rate of less than 3%. As there is pres-

---

1. The Housing and Home Finance Administration was elevated to the Department of Housing and Urban Development.

ently virtually no vacant land available for development in the defendant City of low and moderate income housing to fill existing needs, any construction must of necessity take place in the urban renewal areas. The absence of readily available low-income housing has become more crucial in Hamtramck with the recent displacement of persons by virtue of governmental projects within that City. Certain of these governmental projects occurred on the outskirts or fringe areas of the City's boundary where the greatest concentration of Black citizens resided; the total effect was removal of Black citizens from the community.

The exodus of Black residents from Hamtramck resulted primarily from urban renewal projects but had many supporting factors. Testimony at the trial reveals that strong racial prejudices exist within the defendant City making relocation of displaced Blacks in the community a difficult if not sometimes impossible task. City officials had long been aware that, especially in urban renewal areas, if displaced Blacks were to relocate within the City's boundary, they would find themselves living in slums or substandard housing. As a majority of the persons displaced by governmental projects was Black, and in view of the discriminatory practices of residents within defendant City, it is readily apparent that the high proportion of Blacks displaced by such projects would be forced to relocate outside the City's boundary. Few if any plans were made or implemented by city officials to correct a known unfair practice of discrimination by the white citizens toward the Black citizens of the community.

To the contrary, it would appear that ever since the advent of renewal programs, defendant City has relied on a "planned program of population loss"[2] and has had every reason to know and observe that the loss experienced was primarily in the number of Black residents. Such a program was to be, and in part has been, accomplished through the demolition without replacement of low and moderate income dwelling units and the eventual conversion of land from residential to non-residential use. Throughout it all, federal urban renewal funds were utilized toward fulfillment of the City's program. Dwelling units serving the low-income citizens were demolished while there existed no scheduled replacement of new low-income dwellings. Considering that the areas of the City intended for renewal contained a majority of low-income Black citizens, it appears that the population which the City planned to reduce was its Black population.

For example, the renewal project completed in the "Smith-Clay Area" involved the conversion of that area from residential to industrial use. Such was accomplished through the demolition of a substantial portion of those homes in the southwest part of Hamtramck which section was occupied mostly by Blacks; residents were displaced from their homes and the available land converted into a huge parking lot for the Chrysler Corporation, Dodge Assembly Plant, and for additional industrial and commercial establishments. Testimony of numerous witnesses as well as City officials indicates that no substantial relocation assistance was afforded to those displaced; consequently, the majority of displaced Black citizens were given no assistance in relocating, and, confronted by rampant and overt discrimination in housing, were and will continue to be forced to live outside the defendant City's boundary. The City offered no evidence whatever that it adhered to the Housing and Home Finance Administration requirement that newly available housing be provided in connection with a project involving demolition of a substantial number of minority group homes.[3] Although there is some confusion in the testimony

2. Hamtramck Neighborhood Units Study Volume 3, p. 24.

3. There is no evidence whatever that the City adhered to H.H.F.A. requirements that newly available housing be provided in connection with a project involving demolition of a substantial number of minority group homes. H.H.A. F.A. Urban Renewal Manual, § 10-1, pp. 1 and 2.

as to the number of Black citizens displaced by the "Smith-Clay Project", that number appears to have been substantial and was without question the greater percentage of those displaced by the project. While the records of the defendant City contain certain discrepancies, they do show that 57% of the Black families dislocated by the project moved out of Hamtramck while only 33% of the white families relocated out of the City. In view of the known racial discrimination in housing within the defendant City, and absent any relocation assistance by the appropriate officials it was inevitable that substantially more Blacks than whites would be removed from Hamtramck by the "Smith-Clay Project".

In the same fashion the City plans presently include scheduled renewal and industrialization of two additional fringe areas (the Grand Haven-Dyar-Dequindre" and the "Denton-Miller Area") both of which are predominantly Black; no plans for replacement housing for citizens presently residing in those areas exist. Thus it is apparent that the City is strategically working to achieve a reduction in its total population and indeed hopes to successfully accomplish such by elimination of those residential areas of the City containing Black residents; in the interim no provisions for relocation of those residents within the community exist.

This court finds that according to the original master plan adopted by the City of Hamtramck, and to some extent implemented within the past ten years, the population of the City was to be reduced by the displacement, without relocation, of persons in the City who lived within areas predominantly Black; consequently, a disproportionate segment of those persons removed from the City through renewal projects has been and will be Black citizens.

In addition it would appear that projects not directly associated with urban renewal and consequently not afforded the complete funding and protection provided by Federal Statutes, were also implemented in such a manner as the City's "planned program of population loss." The construction of the Chrysler Expressway sometime in the early 1960's had many effects parallel to those of the "Smith-Clay Area Project". As originally proposed by the State Highway Department, the route of the expressway would have necessitated the removal of no residential buildings in Hamtramck; however, Hamtramck officials did not acquiesce in having the highway placed as proposed but rather suggested a route which would complement the scheduled urban renewal program planned for the "Grand Haven-Dyar-Dequindre Area". The eventual placement of the highway through the northwest section of the City has served to isolate the "Grand Haven-Dyar-Dequindre Area" thereby providing support to the tentative urban renewal plan for the eventual industrialization of property in that area currently zoned residential. As a result of the placement of the expressway at its present location rather than at either previously proposed location, approximately 1,200 persons were displaced from their homes in Hamtramck during the middle 1950's. Since the expressway did not cut through the heart of the City, but instead passed through a fringe area at the northwest corner of the City, the greater majority of dislocated persons were Black. As with the previously implemented renewal projects, so too in this case, testimony convinces that the majority of Black persons displaced by the Chrysler Expressway Project found it necessary to leave the City of Hamtramck so as to obtain adequate housing, although fewer than half of the displaced whites were forced out of the City. Although Blacks constituted less than 15% of the City's population at the time, more than 70% of the persons removed from the City by the construction of the expressway were Black.

Thus, it is apparent that a significant and unacceptable trend having serious racial overtones is detectable in the planning and implementation of defendant City's governmental program of renewal.

Further evidence of this trend can be deduced by a comparison of the above described projects to those found in still another renewal project, the "Wyandotte Area Project". This was the only project affecting a predominantly white area of the community and, coincidently, it is the only project in which replacement housing was scheduled for construction. It is that newly constructed housing which has been enjoined by this court through its order of March 10, 1969. One unfortunate similarity does, however, exist between the "Wyandotte Area Project" and the other programs previously discussed. When the original Wyandotte Project was undertaken, approximately 18 Black families lived in one particular portion of the area in a row of consecutive multi-family flats, the remainder of the homes in the area were occupied by white citizens. Defendant City does not challenge the testimony that the condition of the houses occupied by Black citizens in the area was not significantly different than that of houses occupied by the white citizens. Many, if not all, of the buildings in the area were deemed by the City to be structurally substandard to a degree requiring clearance. Nevertheless, the uncontradicted evidence is that the City proceeded to destroy the houses in which the Black families were living before doing anything to the houses occupied by white persons in the area. Not only was there no relocation assistance afforded these Black individuals, but in addition they were persuaded and even harrassed to vacate their homes speedily and find other dwellings. Because of the discriminatory housing practices in the City, and the consistent failure and refusal by the City to afford adequate relocation assistance, the majority of Black citizens relocated outside the City. Testimony shows that Hamtramck officials were well aware of the difficulties in relocating encountered by these Black citizens, but ignored their requests for assistance, failed to investigate complaints and in no way compensated such displacees for the loss suffered. The evidence is that many displaced Black citizens relocated in dwellings that were unsafe, unsanitary and for the most part uninhabitable.

To a large extend, then, the City has, by virtue of the "Smith-Clay Project", the Chrysler Expressway and the "Wyandotte Project" successfully implemented its planned population loss of Black citizens. In those low-income areas still awaiting renewal, i. e., portions of of the "Grand Haven-Dyar-Dequindre Area" and the "Denton-Miller Area," the City has knowingly permitted a decrease in City services and has actively encouraged the deterioration of the vicinity by dissuading citizens from making any improvements, by encouraging people to vacate the premises, by actively promoting industrialization of the area and by demolition of homes through strict enforcement of Building Code Regulations. Widespread oral and written notice from the City concerning the scheduled industrialization of the area has discouraged new small community type business in both of the areas mentioned and has accelerated the growing blighted condition of the vicinity to such an extent that rehabilitation of residential dwelling is now almost, if not totally, impossible. Slowly, the Black inhabitants are finding it necessary to move out of the areas scheduled for renewal and because of the shortage of low-income housing within the boundaries of defendant City, coupled with the undenied racial discrimination in housing practices, those Black persons who must move find themselves forced to relocate outside of the Hamtramck city limits.

In summary, it is the finding of this court that governmental activities in the City of Hamtramck during the 1960's, including industrial expansion into residential areas, expressway construction, urban renewal projects, and code enforcement activities, have resulted in removal of substantial numbers of Black persons from the defendant City. These activities coupled with racially discriminatory private housing practices were substantially responsible for causing a decrease in the Black population of the City from

14.5% in 1960 to approximately 8.5% in 1966; meanwhile, surrounding municipalities experienced substantial increases in their Black population. If these governmental activities along with the renewal project planned for the future are permitted to go unchecked, the result will be that approximately 74% of those persons displaced by such projects will be Blacks as opposed to approximately 26% who will be white. Having displaced the larger proportion of Black citizens in prior construction projects the City has at the same time reduced the supply of housing available for Blacks or permitted discriminatory housing practices to prevent relocation of Blacks in the community.

The housing plan for the "Wyandotte Area Project" was not intended by Hamtramck to be responsive to the housing needs of Black persons displaced and to be displaced from their homes by governmental activities; such housing was designed principally for the benefit of white senior citizens. The single family residences planned for construction in the "Amended Wyandotte Area" will have a sales price far above the financial means of those Black citizens displaced. The defendant City has not committed itself to arranging for construction of low-income housing on the only remaining land available for the erection of such units.

Much of the above discussion, pertaining directly to the City of Hamtramck and its actions as defendant in this matter, is also related to constitutional and statutory obligations of the federal defendants. Federal approval and funding have been an absolute necessity for carrying out those programs described above. As to the federal defendants, plaintiffs contend that the Department of Housing and Urban Development failed to meet its affirmative obligation to insure adequate relocation facilities for persons displaced by the Urban Renewal Program as proscribed under 42 U.S.C. § 1455(c) and to provide a substantial supply of low-cost housing in project areas as proscribed by 42 U.S.C. § 1455

(f). Plaintiffs further contend that the federal defendants failed to implement a program which would further the ends of fair housing as required by 42 U.S.C. § 3608, and also neglected to insure that federal funds not be used to further a racially discriminatory program in violation of the Fifth Amendment to the Constitution of the United States and 42 U.S.C. § 2000d.

■ The evidence at the trial clearly indicated that as early as April, 1959, before the "Smith-Clay Area Project" was initiated, federal defendants had available to them reports from the defendant City which reports apprised that Hamtramck intended to reduce its population by massive elimination of residential structures; the reports further indicated that the elimination was to take place in predominantly Black areas of the City, and that the land vacated thereby was to be changed from residential to industrial uses without any planned replacement of the dwellings eliminated. It would seem, therefore, that federal defendants knew or should have known very early in the planning stage of the program that a substantial majority of the population removed by urban renewal activities would be Black. Despite this information and knowledge and irrespective of the statutory obligations under which they function, the Department of Housing and Urban Development, through its officers, made no effort to prevent the "Negro removal" which the plans indicated would obviously result from the program. To the contrary, by the very funding of the "Smith-Clay Area Project" and the "Wyandotte Area Project" and by failure to insist upon and enforce adequate relocation of those Black persons displaced, the Department of Housing and Urban Development, by its omissions, acquiesced in the City's program.

By the time the City of Hamtramck applied for additional funds to finance the "Amended Wyandotte Area Project" federal defendants had information through various means (e. g., investigations, interviews and correspondence from the plaintiffs' herein) which would

apprise them of the inadequate and discriminatory relocation practices in the defendant City. Defendants were also cognizant of the racial prejudices of City officials controlling the Urban Renewal Projects, of the decline in Hamtramck's Black population, of the disproportionate displacement of Black citizens as compared to white citizens, of defendant City's awareness that "Negro removal" was resulting from the Urban Renewal Projects, and of the apparent apathy of the defendant City toward the violation of the rights of the Black citizens in the community. Thus, by approving the City's plans for the "Amended Wyandotte Area Project", the federal defendant knowingly assisted in advancing the violation of the rights complained of herein.

Apparently, the only basis for the federal defendant's decision to dismiss the plaintiffs' complaint and approve the "Amended Wyandotte Area Project" was the "guarantee" by Hamtramck officials of compliance with the law and the assurances that better relocation assistance would be provided in the future. In view of the investigation having been conducted, it would seem that these assurances were unreliable; even if the City's assurances as to non-discrimination, relocation and reestablishing proper priorities had been reliable, such would have been inadequate and unresponsive to plaintiffs principal allegation, that of "Negro removal".

The Department of Housing and Urban Development did not analyze or consider the "Amended Wyandotte Area Project" in light of those complaints filed by plaintiffs concerning prior projects and future plans. The amended project as proposed and approved by the Department of Housing and Urban Development contained no plan for housing within the income ranges of Hamtramck's Black citizens and no plans for providing housing for persons dislocated by the "Smith-

Clay Area Project" and by the Chrysler Expressway Project and those to be displaced by the "Denton-Miller Area Project" and the "Grand Haven-Dyar-Dequindre Area Project". Consequently, the "Amended Wyandotte Area Project" will neither promote integration or fair housing, but instead, will in effect, reinforce the segregated housing patterns in Hamtramck. In addition, although the planned redevelopment of the "Amended Wyandotte Area Project" is residential in nature, it does not provide housing to serve the poor and disadvantaged people of the slums and blighted areas who are most affected and therefore most deserving to benefit from renewal projects. In summary, Black citizens of Hamtramck continue to be removed from their homes in the community with no steps taken to protect their rights under the law.

## CONCLUSIONS OF LAW

█ Having made the above findings of fact, the court now turns to the law applicable to this case. In determining the legality and constitutionality of the "Wyandotte Area Project" and the patterns of governmental activities complained of by plaintiffs, consideration need not be limited to the Wyandotte Project or the persons located within the area, but may be given to the foreseeable impact of all governmental activities connected therewith. No one renewal project in a community stands independent and unrelated to other such projects. Under Michigan law it is necessary for the municipality reasonably to foresee the effect of one project on the physical, social, racial, and economic factors within the City, (Michigan Blighted Areas Rehabilitation Act, M.C.L.A. § 125.74(2) (b) [M.S.A. § 5.3504(2) (b)]);[4] under existing federal statutes, it is also necessary for the Department of Housing and Urban Development carefully to make the same considerations, (See 42 U.S.C. §

4. Michigan Blighted Areas Rehabilitation Act, M.C.L.A. § 125.74(2) (b) ; § 4(a) of the Act, effective June 22, 1968 states:
"No action taken under this Act shall have the effect of promoting or perpetuating racial segregation in housing. * * *"

1455(a), 42 U.S.C. § 1460(b) (1) and 42 U.S.C. § 2000d).[5] These statutes have been interpreted to guarantee that in planning and approving proposed urban renewal programs, consideration must be given to the impact of the programs upon minority groups as a whole in the community, and that such consideration must include reference to discriminatory housing practices throughout the locality. Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 395 F.2d 920 (2nd Cir., 1968).

In view of the above enunciated findings, it would appear that when this complaint was first made by plaintiffs to the Department of Housing and Urban Development at the time of planning, proposing and funding of the "Amended Wyandotte Area Project", contrary to statutory obligation, neither the municipality nor the federal defendants considered the known practices of "Negro removal" in previous projects nor the pronounced fears of violations of the rights of minority groups in the community as a whole.

■■ Since the enactment of the Housing Act of 1949, it has been clear that a feasible method for relocation of persons displaced by urban renewal projects in safe, decent, and sanitary housing has been a condition precedent to receipt by a municipality of loans and grants under the Act. Therefore, by virtue of the execution with the Federal government of a loan and grant contract for urban renewal purposes, the City of Hamtramck accrued affirmative relocation obligations, including obligations to render referral assistance to persons displaced by renewal projects. See 42 U.S.C. § 1455(c). The federal government has, by virtue of its own policies and publications, interpreted this section of the Housing Act of 1949 to require that

displacees be informed of their relocation rights, be provided assistance in relocating in safe, decent and sanitary housing and further be protected through inspections of substitute dwellings so as to insure that those dwellings meet the above requirements. As it relates to the "Smith-Clay Area Project" and the "Amended Wyandotte Area Project", the evidence indicates that the City of Hamtramck demolished a substantial amount of housing theretofore available to a minority group, and made no provision for obtaining newly-available housing for the Black persons displaced by the project. Such failure was in contradiction to established policies of the federal government,[6] and in addition constituted a violation of § 105(c) of the Housing Act of 1949 (42 U.S.C. § 1455 (c)) and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. See Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 395 F.2d 920 (2nd Cir., 1968).

■■ In addition, as the purpose of the Housing Act of 1949 is to encourage "development of well-planned, integrated, residential neighborhoods," (42 U.S.C. § 1441), it was incumbent on defendant City when planning and implementing the "Amended Wyandotte Area Project" to consider the planned industrialization of the "Denton-Miller Area" and the "Grand Haven-Dyar-Dequindre Area". The Housing Act requires that the local municipality have a "workable program" for urban renewal projects, and as the City was deeply involved in industrializing the predominantly Black "Denton-Miller" and "Grand Haven-Dyar-Dequindre" areas, full consideration should have been given to the housing needs of the residents of these areas at the time that the "Amended Wyandotte Area Project" was being proposed and approved. In other words, the City

5. Both 42 U.S.C. § 1455(a) and 42 U.S.C. § 1460(b) (1) refer to a consideration of the "locality as a whole."

6. 42 U.S.C. § 2000d states:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

knew of its intent to industrialize these areas and should have, in formulating its plan for the "Amended Wyandotte Area Project", made relocation provisions for those persons who were to be displaced from areas scheduled for industrialization. The findings are that defendant City has effectively displaced Black residents from the "Denton-Miller Area" and from the "Grand Haven-Dyar-Dequindre Area" through various unlawful means. To do so at a time when the City had a grave shortage of low-income housing and an awareness of extensive discriminatory housing practices amounts to a violation of the rights of those plaintiffs under the Fourteenth Amendment of the Constitution of the United States. The "Amended Wyandotte Area Project" in its present form calls for a substantial reduction in the City's housing supply and an even greater reduction in the low-income housing supply, and as such, it contradicts the very purpose of the Housing Act and opposes the minority group consideration requirements found therein. The defendants simply cannot surreptitiously permit and encourage displacement of Black residents from their homes in areas scheduled for renewal without taking reasonable steps to assure that housing for rental or purchase will be made available to those displaced. At present, the only land available for construction of such housing lies within the "Amended Wyandotte Area" boundaries. It is incumbent on Hamtramck to remedy the wrongs to those citizens of its community who have been illegally displaced and removed from the City.

Any discussion of Hamtramck's duties and responsibilities cannot be segregated from a realization that the federal government's involvement in the various Hamtramck programs included the approval and funding necessary to carry out those programs. Urban renewal is accomplished through federal means, and the federal government must take responsibility for the direction which the program takes. Since urban renewal could not exist without the federal government, the government must insure that a program is not directed primarily at "Negro removal". For the Department of Housing and Urban Development to direct, fund, and foster programs that have harmed and, if unchecked, will continue to harm the Black citizens of Hamtramck, and to proceed with such activities by claiming innocence of what has been or is being done with federal funds cannot be tolerated. If what has occurred in Hamtramck is ever to be stopped, responsibility must be placed at the source, that is, the Department of Housing and Urban Development which funds and administers the programs. It must be clearly understood that in order for the City of Hamtramck to bring about the "Negro removal" and ancillary discriminatory results of which plaintiffs are complaining in this action, federal financial assistance and involvement was essential.

■■ Once involved, the Department of Housing and Urban Development had the same duty as Hamtramck, under law, to consider the total needs of the community, including, but not limited to, problems of slums, blight and the special needs of minority groups therein. In view of plaintiffs' complaint made to the Department prior to the funding of the "Amended Wyandotte Area Project", and the findings made by the investigation conducted thereon, the Department had an affirmative duty to insure that the "Amended Wyandotte Area Project" would not result in further "Negro removal" from the City but rather would alleviate the problems previously created as well as those foreseen.[7] The Housing

7. 42 U.S.C. § 1455(c) states:
"There shall be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban

Act of 1949 provides substantial safeguards which, if administered conscientiously by the Department of Housing and Urban Development, will prevent the discriminatory uses of federal urban renewal funds and programs. In administering the Act the Department of Housing and Urban Development must continuously assure that violations do not occur and must keep in mind the central purpose of the Act, that is, the "realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. See, Powelton Civil Home Owners Association v. HUD, 284 F.Supp. 809 (1968, E.D.Pa.); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (1968, N.D. Cal.); Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970).

Despite the numerous investigations and alleged constant surveillance by the Department of Housing and Urban Development over the City of Hamtramck, this court concludes that federal defendants failed to insure adequate relocation facilities, substantial low-cost housing, fair housing and lack of discriminatory

practices. Such failures constitute a violation of those statutes under which the Department operates.

■ The court also concludes that the decision by the Department of Housing and Urban Development to approve the "Amended Wyandotte Area Project" and to dismiss plaintiffs' complaint regarding the proposed project based on mere assurances by City officials that relocation practices would be improved, was completely unsupported by substantial evidence which had been gathered through investigations. Those investigations reveal a concrete basis for plaintiffs' complaint regarding the conduct of Hamtramck as it related to urban renewal projects; the Department of Housing and Urban Development has presented in this matter nothing to indicate on what grounds it chose to dismiss plaintiffs' complaint and continue to support the renewal project in Hamtramck. By virtue of their investigation, the Department of Housing and Urban Development had knowledge of the fact that the federal funds made available to Hamtramck were, to some extent, being utilized to remove Black citizens from the community. The federal defendant also

renewal area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment. The Secretary shall issue rules and regulations to aid in implementing the requirements of this subsection and in otherwise achieving the objectives of this subchapter. Such rules and regulations shall require that there be established, at the earliest practicable time, for each urban renewal project involving the displacement of individuals, families, and business concerns occupying property in the urban renewal area, or relocation assistance program which shall include such measures, facilities, and services as may be necessary or appropriate in order (A) to determine the needs of such individuals, families, and business concerns for relocation assistance; (B) to provide information and assistance to aid in relocation and otherwise minimize the hardships of displacement, including information as to real estate agencies, brokers, and boards in

or near the urban renewal area which deal in residential or business property that might be appropriate for the relocating of displaced individuals, families, and business concerns; and (C) to assure the necessary coordination of relocation activities with other project activities and other planned or proposed governmental actions in the community which may affect the carrying out of the relocation program, particularly planned or proposed low-rent housing projects to be constructed in or near the urban renewal area.

As a condition to further assistance after August 10, 1965 with respect to each urban renewal project involving the displacement of individuals and families, the Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that decent, safe, and sanitary dwellings as required by the first sentence of this subsection are available for the relocation of each such individual or family."

See 42 U.S.C. § 1455(f), *infra*, footnote 9, 42 U.S.C. § 3608(d) (5), *supra*.

knew that Hamtramck's plans encompassed the demolition of houses in Black sections, the transfer of those sections from residential to industrial uses, and the redevelopment of housing in other cleared areas with units not geared for low-income persons. Despite this knowledge the Department of Housing and Urban Development approved the "Amended Wyandotte Area Project"; to do so in light of its knowledge of Hamtramck's illegal activity in violation of the rights of Black citizens was equally violative of plaintiffs' rights under the 1964 Civil Rights Act, Title 6 (42 U.S.C. § 2000d) [8]

In effect, the Department of Housing and Urban Development sanctioned the violation of plaintiffs' rights when it could have halted any discriminatory practices contained in the program. See Hicks v. Weaver, D.C., 302 F.Supp. 619 (1969). At the same time, by not requiring special relocation assistance for minority persons displaced by the "Amended Wyandotte Area Project" and the "Smith-Clay Project", the Department of Housing and Urban Development violated plaintiffs' rights under the Fifth Amendment of the Constitution of the United States and under § 105(c) of the Housing Act of 1949 (42 U.S.C. § 1455(c)).

The 1968 Civil Rights Act provides in part that it is the duty of Secretary of Housing and Urban Development to

"(5) * * * Administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." (42 U.S.C. § 3608 (d) (5)).

It is the further finding of this court that the Department of Housing and Urban Development, contrary to the above quoted statute, did not analyze, consider or affirmatively utilize opportunities to further the ends of fair housing in its approving and funding of the "Amended Wyandotte Area Project"; its failure to do so was violative of 42 U.S.C. § 3608(d) (5). See Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970). In addition, HUD did not evaluate the proposed development of the "Amended Wyandotte Area Project" pursuant to the requirements of 42 U.S.C. § 1455(f).[9] Although the planned redevelopment of the area was residential in nature, the project did not "provide a substantial number of units of standard housing of low and moderate cost and result in marked progress in serving the poor and disadvantaged people living in slum and blighted areas." 42 U.S.C. § 1455(f).

In conclusion, the Department of Housing and Urban Development has not acted in compliance with procedures required by law and has denied plaintiffs those rights guaranteed by the Constitution of the United States.

### ORDER

Therefore, it is ordered that the defendant City of Hamtramck and the defendant Department of Housing and Urban Development, in cooperation with the plaintiffs, present to this court within ninety (90) days from the date of this order a program designed to remedy the wrongs suffered by virtue of defendants' conduct. It is essential to this order that the remedy devised include an increase of low and moderate income housing for those Black persons who have been and are scheduled to be displaced by renewal projects. Such a plan should encompass construction of new housing as well as a profound, meaningful, comprehensive and enforceable program to eliminate the existing discrimination in housing within the City so as to make available to Black citizens those existing dwellings geared for low-income individuals. The plan should also provide

8. See 42 U.S.C. § 2000d, footnote 7, *supra.*

9. 42 U.S.C. § 1455(f) as applicable to this case reads:
"The redevelopment of the urban renewal area, unless such redevelopment is

for predominately nonresidential uses, units of standard housing of low and moderate costs and result in marked progress in serving the poor and disadvantaged people living in slum and blighted areas."

for a sufficient number of units, either through construction of new homes or through the elimination of discriminatory real estate practices, so as to accommodate all those displaced, past and future. Along with the scheduled increase in housing, the plan should also provide a specific and scheduled program for the relocation of any additional persons displaced through code enforcement, renewal projects, or encroaching industry. Finally the plan must contain an acceptable time schedule in which all of the above is to be accomplished.

Although the plan to be submitted will pertain primarily to the land contained in the "Amended Wyandotte Area Project", it is not of necessity limited thereto, but may encompass the entire Hamtramck area. Both defendants shall do all things necessary to insure that a plan is developed which meets the legal requirements set forth by statute, results in marked progress in serving the poor and disadvantaged living in slum and blighted areas in Hamtramck, is in conformity with the requirements of this court's order, and is non-discriminatory so as to provide fair housing.

This court shall retain jurisdiction of this matter until further order.