**Gordon YARBOROUGH et al.,**
**Plaintiffs,**

v.

**CITY OF WARREN et al., Defendants.**

**Civ. A. No. 35843.**

United States District Court,
E. D. Michigan, S. D.

Oct. 11, 1974.

---

William H. Goodman, Robert L. Reed, Michigan Legal Services Assistance Program, Thomas C. Carey, and George G. Matish, Legal Aid Society of Detroit, Detroit, Mich., for plaintiffs.

Thomas Landy, Asst. City Atty., Warren, Mich., Robert J. Lord, Fair Haven, Mich., Fred M. Mester, Asst. U. S. Atty., Detroit, Mich., Eugene R. Bolanowski, Kenneth R. McAlpine, Warren, Mich., for defendants.

## MEMORANDUM OPINION

PHILIP PRATT, District Judge.

Plaintiffs, residents of the City of Warren, Michigan, the National Association for the Advancement of Colored People (hereinafter the NAACP) and others have brought two civil rights actions arising out of the elimination of an urban renewal program in Warren. First, plaintiffs allege that the municipal defendants (the City, the Mayor and three City Council members) violated their rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment and under 42 U.S.C. §§ 1982 and 1983 and 42 U.S.C. § 3601 et seq. (the Fair Housing Act of 1968). Second, plaintiffs allege that the federal defendants (officials of the Department of Housing and Urban Development) violated their rights as guaranteed by the Fifth Amendment and 42 U.S.C. §§ 3608

(c) and 3608(d)(5). Jurisdiction of this Court is proper under 28 U.S.C. § 1343, 28 U.S.C. § 1331 and 42 U.S.C. § 3612.

The Court, having received testimony and other evidence through twelve days of trial, from December 11, 1973 to January 8, 1974, having heard oral argument, and having duly considered the briefs of the parties and the evidence hereby makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

At a general election in the City of Warren, Michigan on November 3, 1970 voters approved the following proposal by a vote of 26,471 to 19,906:

"Shall the Council of the City of Warren repeal each and every section of Title 10, Chapters 1, 2 and 3 of Ordinance 80 as amended?"

As a result of the passage of this proposal and after the entry of a mandamus judgment on March 23, 1971 in Macomb County Circuit Court, the Warren City Council enacted an appropriate repealing ordinance on April 6, 1971. By this action the Council repealed general provisions (enacted pursuant to the Michigan Blighted Area Rehabilitation Act, M.C.L.A. § 125.71 et seq.) necessary to permit funding relations between Warren and the Department of Housing and Urban Development for Warren's Neighborhood Development Program (an urban renewal program authorized by 42 U.S.C. § 1469 et seq.) and thereby terminated that program in Warren.

The defendant City of Warren, Michigan is a Michigan Municipal Corporation organized pursuant to the Michigan Home Rule Cities Act, M.C.L.A. § 117.1 et seq. The City Council is the legislative body of Warren. The individual defendants, L. Klimecki Dannis, Stephen Jury, Jr., and Richard Sabaugh were elected members of the City Council in April, 1969. Defendant Ted Bates was Mayor of the City of Warren (the City's chief executive officer) at the time of the referendum.

Warren borders the north side of the City of Detroit, Michigan. In 1970 Warren had a population of 179,260 of whom 132 were black. Warren has a large industrial base, and approximately 6,500 black Americans are employed in the City. Housing in Warren includes owner-occupied residences, condominiums, apartments, mobile homes, and low-income housing.

At various times from 1963 to 1967 acts of refusals to sell or lease homes or equivocation were shown to have occurred with respect to four black families: Mr. and Mrs. Earl E. Bass, Mr. Melvin White, Mr. and Mrs. Irene Lilly and Col. and Mrs. Washington. The Lilly family eventually succeeded in buying a home in Warren. Other testimony of Dr. Lillian Bauder and Mr. J. F. Charbonneau purporting to show that they were unsuccessful in finding homes for blacks in Warren is not conclusive, in the Court's opinion, inasmuch as supposed acts of equivocation and the availability of homes were not clear.

Since November 3, 1970, four fair housing complaints have been filed with the Michigan Civil Rights Commission (the organ charged with enforcing the Michigan Fair Housing Act of 1968, M.C.L.A. § 564.101 et seq.) regarding homes in Warren. Three of these complaints were dismissed, and one was adjusted.

Between 1961 and 1971 various contacts were made between the City of Warren and the federal government, Department of Housing and Urban Development, regarding urban renewal planning for Warren, beginning with a 1961 application by Warren for funds to prepare a Master Plan for an urban renewal program.

On August 21, 1962 the City Council of Warren authorized the forwarding of materials to the federal government seeking approval of a "workable program" for community improvements. 42 U.S.C. § 1451(c). A "workable program" is a community's comprehensive view of its housing and redevelopment needs and its plans for meeting these needs. It is a

broad planning document which seeks to produce a coherent and balanced approach to these needs by coordinating the use of federal and local resources. The workable program consists of four areas: code adoption and enforcement; planning and programming; housing and relocation; citizen involvement. Implementation of 42 U.S.C. § 1451(c) is achieved through an HUD Handbook, "Workable Program for Community Improvement," M.P.D. 7100.1a. A workable program for a community must be recertified by the federal government each year before federal funds may be provided for urban renewal.

In 1969, pursuant to a Community Renewal Program, a further planning stage in the implementation of an urban renewal program, a Community Attitude Survey was conducted in Warren. Data for the survey was collected through approximately 700 interviews.

On November 12, 1968 the Warren City Council authorized the filing of an application for a Neighborhood Development Program (NDP). An NDP, as authorized by 42 U.S.C. § 1469, is an urban renewal project carried out on the basis of annual increments in one or more project areas. The NDP is a long range effort to achieve better communities through planned rehabilitation or redevelopment of deteriorated and deteriorating areas, both residential and non-residential, and the removal of factors that create slums and blight. It is locally conceived, planned and carried out and involves cooperation among local governments, state governments, private enterprise, citizens, and the federal government. A salient difference between NDP and other urban renewal plans is that funding is based upon a twelve month period, utilizing urban renewal funds to meet current activities. Each such period is termed an "action year," and the NDP must be recertified or approved for each action year.

The Warren NDP contemplated the following:

(a) The provision of local grants-in-aid.

(b) A feasible method for the relocation of persons displaced from urban renewal areas.

(c) Other local obligations and responsibilities in connection with the undertaking and carrying out of the program.

The City was to meet one-third ($\frac{1}{3}$) of the total cost and the federal government two-thirds ($\frac{2}{3}$). However, Warren was to be credited for non-cash community improvements either already in existence or contemplated for the NDP area, and no additional cash disbursements were contemplated from the City's general fund budget. Thus Warren had accumulated non-cash credits of $7,000,-000, sufficient to entitle the City to $14,000,000 of federal aid, or enough for projected NDP needs for ten years.

The Warren NDP as it operated from April 1, 1969 to termination (the first and only action year) consisted of the following:

1.) The designation of three NDP districts, or areas: the McKinley Park Area, the Nine Mile and Van Dyke Area and the Ten Mile and Schoenherr Area.

2.) Rehabilitation of existing structures through grants and loans to individuals.

3.) Clearance of properties which were structurally substandard and economically unfeasible to rehabilitate. Sixteen families and one business were thus displaced.

4.) Relocation of the aforesaid families and businesses displaced.

5.) Public improvements such as streets, sidewalks, parks and school property.

6.) Citizen participation through Neighborhood District Councils in each of the NDP areas.

7.) Further planning involving the City Planning and Urban Renewal Commission, the District Councils and overall control by the City Council.

In addition to these elements, the NDP was intended to include 100 to 200 units of relocation housing (which were not built) in the McKinley Park and Nine Mile-Van Dyke Areas. Although 100 units of new low-income housing were discussed at one time, that proposal was rejected. Thus, the Warren NDP involved no new, open, low-income or public housing.

On February 12, 1969 HUD and Warren officials met in Warren to discuss the City's Workable Program and "equal opportunities" concerns in Warren.

On April 1, 1969 HUD and the City of Warren executed an NDP Master Agreement and a Funding Agreement for the first action year of Warren's NDP.

On March 9, 1960 Francis Fisher, Regional Administrator of HUD in a letter to Mayor Ted Bates concerning funding for the second NDP action year and recertification of the City's Workable Program indicated that further steps by the City to provide equal opportunity in housing would be necessary before such refunding and recertification could be achieved. He suggested thirteen steps the City might take in this regard.

After further meetings with HUD and Warren officials it was agreed that two actions would suffice for such refunding: passage of an open housing ordinance and provision for a community relations board. On June 16, 1970 both were approved by City Council.

On July 21, 1970 HUD indicated by letter to the Warren City Planner that the application for funding of the second action year of Warren NDP had been approved but that funding would be deferred pending appointment of the Community Board.

From July 21 to July 28, 1970 a series of newspaper articles appeared in newspapers circulated in Warren, characterizing HUD actions regarding the Warren NDP as a plan designed to force integration in the suburbs, with Warren as the test target.

On July 27, 1970 Secretary of Housing and Urban Development Romney visited Warren, ostensibly to allay the impression of HUD's role created by this publicity. A large and vociferous crowd received him.

On August 10, 1970 a petition was filed with the Warren City Clerk, containing approximately 14,800 signatures, demanding a referendum upon the legislation permitting Warren's NDP funding agreements with the federal government. The petition asked that the referendum question, *supra,* be placed on the ballot at the November 3, 1970 general election. Sections 6.9, 6.10 and 6.11 of the Warren City Charter of 1956 and M.C.L.A. § 117.4i(6) authorize such petition and referendum procedure.

Between the time of the filing of this petition and November 3, 1970, a series of meetings was held at various locations in the city, during the course of which arguments were presented for and against urban renewal and NDP. A broad surge of criticism of NDP was voiced, including the issue of integration and HUD requirements for NDP.

On November 3, 1970 the referendum took place, with the results previously detailed. The aforementioned mandamus judgment of March 23, 1971 commanded the members of the Warren City Council to perform all necessary ministerial and legislative acts necessary to repeal the ordinances in accordance with the referendum. Subsequently NDP was terminated, and the Community Board was not appointed.

*Standing*

■ At the outset it is appropriate to note that the plaintiffs have standing to raise the claims alleged here (especially since the municipal defendants have alleged that plaintiffs are not the real parties in interest). The United States Supreme Court has clearly stated that the N.A.A.C.P. has standing to assert the rights of its members. N. A. A. C. P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Louisiana ex rel. Gremillion v. N. A. A. C. P., 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961). In

the case at bar plaintiffs have presented testimony indicating that at least two black members of the N.A.A.C.P. had unsuccessfully sought housing in Warren. These and other N.A.A.C.P. members who have been unable to move into Warren would have standing to raise the constitutional claims here. Similarly such unsuccessful minority homeseekers would have standing to assert claims under the Housing Act via the N.A.A.C.P. Otero v. New York City Housing Authority, 484 F.2d 1122 (2nd Cir. 1973); Banks v. Perk, 341 F.Supp. 1175 (D.C. 1972).

There is, however, a weakness in the plaintiffs' case as to this issue of standing which also spills over and into the equal protection issue which is discussed subsequently.

### Evidence

■ Numerous evidentiary objections arose in the course of the trial, many of which were taken under advisement and a separate record made. Much of this testimony concerned incidents with housing salesmen related by unsuccessful buyers. Such evidence is not hearsay within the definition of Rule 801 of the Proposed Federal Rules of Evidence (51 F.R.D. 315) insofar as it establishes the conduct of the salesmen indicating equivocation and refusal to sell. Ford Motor Co. v. Webster's Auto Sales, 361 F.2d 874 (1st Cir. 1966). Such testimony is arguably relevant to the claimed "historical context" of the referendum, in which regard the Court wished to allow plaintiffs great latitude to demonstrate their claim, while reserving, of course, the question of the weight to be accorded such evidence.

■ There was also evidence adduced as to the conduct and attitude of the Warren police authorities in situations of threat, abuse and violence revolving about the Bailey family's (a racially mixed marriage) purchase of a home in Warren. The evidence here was conflicting and did not rise to the level of establishing a policy of purposeful discrimination but was considered as a part of the historical context.

■ Other evidence objected to, such as the series of newspaper articles and testimony of statements made in connection with the petition and referendum, was ostensibly concerned with the issue of motivation. Although the Court has rejected motivation as a proper subject for inquiry here, the Court will receive them as background information of the events at issue, and as evidence of the "historical context" contended for by plaintiffs, again with an eye toward allowing a complete airing of plaintiffs' claims. The newspaper articles are particularly relevant as regards the background of the referendum, and are not objectionable hearsay inasmuch as they were offered with the express stipulation that they were not intended to prove the truth of the matters reported therein. Again by according this evidence the proper weight, the Court limits the significance of the motivation aspects.

■ The last broad category of testimony objected to is expert opinion. The opinion testimony of Dr. Lillian Bauder and Dr. Donald Warren was a crucial portion of plaintiffs' case since it was virtually the only proffered evidence indicating the impact of the referendum on the people of Warren and other areas. Both may qualify as experts since both possess doctorates in sociology, have several years of teaching experience, and have done research in the area of race relations. The Court will receive the opinions of both as well, even though certain factors cast doubt upon the weight of such opinions, bearing in mind the expansive language of Proposed Federal Rule of Evidence 702 (51 F.R.D. 315) that a witness, qualified as an expert, may testify if his specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue . . ." Several factors diminish the weight which the Court may afford this opinion evidence. Dr. Bauder, a former Warren resident, freely ad-

mitted her personal and emotional involvement in the events which were the subject of the major portion of her testimony and in racial issues in Warren. She pointed out that possible bias was one reason advanced by many sociologists against acceptance of "immersion" or personal involvement social research, which was her mode of "research" in Warren. Further, her opinion as to the impact of the referendum upon blacks in Detroit was at least diluted, if not negated by her admission that she had done no research in this regard but was merely extrapolating from an undetermined number of conversations with acquaintances.

As to Dr. Warren, his testimony concerning the role of race in the referendum was qualified upon questioning by the Court to indicate that race was one of eight to twelve factors in the vote. His statements concerning the impact of the referendum upon Warren residents also must be received guardedly inasmuch as he admittedly made those judgments based upon the Warren Community Attitude Survey of 1969 and a smaller earlier survey of his own in 1968. He did not base his opinion upon any post-referendum data, except some analysis of precinct voting data which he stated indicated some varying positive correlations between voting and Community Survey results.

## Constitutional Claims

The primary question presented by the plaintiffs' claims against the municipal defendants is whether the referendum of November 3, 1970 and its effects violate the plaintiffs' rights under the Fourteenth Amendment by denying access to housing in Warren. At the outset the Court notes that a referendum constitutes state action subject to the requirements of the Fourteenth Amendment. Southern Alameda Span. Sp. Org. v. City of Union City, Cal., 424 F.2d 291, 294 (9th Cir. 1970) (hereinafter cited as "SASSO"); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

## Due Process

The claims of lack of due process must fail on the authority of SASSO (supra at 294) and Ranjel v. City of Lansing, 417 F.2d 321, 324 (6th Cir. 1969) since legitimate reasons existed for rejection of NDP. Some of these reasons were detailed by Warren City Planner Jerome Schmeiser in his recitation of citizens' criticisms of NDP at public meetings:

> "Well, they range from a million dollars being buried in my back yard to dissatisfaction with governmental intervention . . . They did not want commercial in a given area. They did not want multiple housing in a given area . . . They may not have liked the laws as they relate to the selection of the citizens' district council or our general method of citizen participation."

Furthermore, as the Court in SASSO, supra, stated at 294, of 424 F.2d, "many environmental and social values are involved in a determination of how land would best be used in the public interest." Thus the Court cannot find that the termination of NDP was so unrelated to acceptable standards of public interest as to constitute an arbitrary or unreasonable exercise of the police power. The Court also reiterates what was said in the Court's opinion on defendant's Motion for Summary Judgment, that in such a case the motivation of the electorate is not only impossible to ascertain, but it is not a proper subject for judicial inquiry. Ranjel, supra, 417 F.2d at 324; SASSO, supra, 424 F.2d at 295.

## Equal Protection

Plaintiffs' claim of a denial of equal protection by the referendum and its effects is based upon an alleged denial of equal access to housing in Warren for black Americans. The alleged injury is said to result not only from the elimination of NDP, but from an "impact" which included the "encouragement" of private discrimination through the "message" which the referendum conveyed to the

citizens of Warren—that the City of Warren would not interfere with the efforts of brokers and others to keep Warren substantially all white. This same message, as allegedly received by black persons outside Warren, is the basis of plaintiffs' claim under 42 U.S.C. § 3617.

In assessing these claims it is essential to understand what NDP in Warren was. In general, as noted *supra*, NDP programs are urban renewal programs carried out on an *annual* basis. In particular, the Warren NDP, as it affected housing involved: 1) no new low-income housing except as necessary for the relocation of displaced Warren residents; 2) planned relocation housing of approximately 100 to 200 units in the McKinley Park and Nine Mile-Van Dyke areas; 3) actual displacement and relocation of sixteen families and one business. In addition to these elements, the Department of Housing and Urban Development made two of several "equal opportunity" suggestions conditions for approval of second action year funding for Warren's NDP. These were the passage of a Fair Housing Ordinance and creation of a Community Relations Board. Neither was repealed by the referendum, although the board was never appointed thereafter. While the Warren NDP could have grown and changed (some plans had been made for future years) and while more suggestions or conditions might have been imposed by HUD, the program was intended to be funded for separate *yearly* programs and affirmative steps, application and approval, by both Warren and HUD were necessary each year to continue the program. Thus the Court cannot and should not speculate as to what NDP might have been in assessing the significance of its termination, but rather it must focus upon what the program was, as far as it actually progressed.

As was briefly alluded to in the discussion on standing, a particular weakness of plaintiffs' case must be considered. Reference is made to the fact that there was no showing that any of the plaintiffs herein would or could have qualified for any housing under the Warren Neighborhood Development Program. Nor does the Court understand that plaintiffs make any claim to that effect.

■ Thus, the elimination of the NDP alone, involving, as it did, only relocation housing, cannot be said to deny equal protection to plaintiffs or to minorities by denying access to housing in Warren. However, plaintiffs claim to have shown a history of private housing discrimination in Warren and racial rhetoric surrounding the referendum which together create an impermissible "impact" which encourages further private discrimination.

Plaintiffs rely for this contention of encouragement upon Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Such reliance is misplaced for two reasons. First, the use of the term "encourage" by the Supreme Court in *Reitman* was based upon the affirmative aspects of the constitutional amendment then under scrutiny. While the Court noted with approval the conclusion of the California Supreme Court at 375, 87 S.Ct. at 1631 that:

> ". . . a prohibited state involvement could be found 'even where the state can be charged with only encouraging,' rather than commanding discrimination."

the United States Supreme Court further approved the California Supreme Court's explanation that the term "encouraged," "within the meaning of the cited decisions" meant "legislative action 'which authorized private discrimination' and made the State 'at least a partner in the instant act of discrimination . . .'" *Id.* at 375, 87 S.Ct. at 1631.

This affirmative interpretation was also clear from the Court's response to the criticism that any repeal of a "statute prohibiting racial discrimination" could be said to so authorize discrimination. In this regard the Court stated at 376, 87 S.Ct. at 1631:

> ". . . it (the California Supreme Court) held the intent of § 26 was to authorize private racial discrimina-

tions in the housing market, to repeal the Unruh and Rumford Acts and to create a constitutional right to discriminate on racial grounds in the sale and leasing of real property.

The California court could very reasonably conclude that § 26 would and did have wider impact than a mere repeal of existing statutes."

Apropos of the latter statement the Supreme Court later noted in a footnote to the Court's opinion in Hunter v. Erickson, 393 U.S. 385, 390, 89 S.Ct. 557, 560, 21 L.Ed.2d 616 (1969):

"Thus we do not hold that mere repeal of an existing ordinance violates the Fourteenth Amendment."

Insofar as there is not any affirmative authorization but only encouragement here, *Reitman* is thus inapposite.

Plaintiffs' reliance on *Reitman* is also inappropriate because the "impact" of the act there challenged was far different from the impact claimed here. With the exception of the failure to appoint the Community Relations Board, the impact claimed here is entirely psychological, consisting of "encouragement." In *Reitman* impact was discussed in terms of the "historical context" of the pre-existing *legal* environment created by the Unruh and Rumford fair housing acts, and the resulting constitutional "right" to discriminate held to have been created by the constitutional amendment. In Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2nd Cir. 1970) the Court extended this view to consider the history of the City of Lackawanna as part of the relevant historical context. There, however, the impact of the City's actions was not psychological, rather it was the denial of a low-income housing site. In the *Reitman* and *Lackawanna* sense of the term, the impact of the Warren referendum was to disable the city from entering a new NDP agreement, a result which does not deny equal protection. In none of the other cases cited by plaintiff (with the single exception of Holmes v. Leadbetter, 294 F.Supp. 991 (D.C.1968)) has

a denial of constitutional rights been founded upon the theory of psychological impact alone. (*Holmes* was a unique case involving a threat of further violence in the wake of the Detroit riots of 1968). This Court can find no reason to extend *Reitman* to cover such impact. Rather, there exist sound reasons not to so extend *Reitman,* notably serious problems of proof.

As respects proof of an impact encouraging private discrimination here, plaintiffs have offered only the historical context and certain expert testimony. The most pertinent of the latter was the following statement of Dr. Warren regarding the "climate of opinion" in Warren:

"I would say a climate of opinion (existed) that militated against a change in race relations or housing patterns pertaining to race, and that the effect of this (referendum) was to support or reinforce a sense of concern about racial change."

Such a broad statement is tenuous support for a claim of housing *discrimination* and too frail an evidentiary reed to warrant relief here, especially when: 1) the statement was not based upon any post referendum research, and; 2) no evidence of any post-referendum housing discrimination or attitude research was presented.

The historical context presented allows the Court no further inferences which would aid plaintiffs. Indeed, insuperable difficulties appear involved in any attempt to prove that individuals were affected psychologically in any way by an election absent any proof of overt acts. As to the failure to appoint the Community Board, suffice it to say that the Board was to be advisory in any case, that its significance can only be a matter of speculation and that in any event its absence alone cannot be said to be a denial of a constitutional right.

The Court also notes that the repeal here was not only an act neutral upon its face as to race as in *SASSO, supra,* but the act repealed had nothing to do

with fair housing. Indeed, as has been pointed out, the fair housing ordinance passed in the course of the NDP remained after the NDP was gone.

Since the trial of this cause, the Sixth Circuit Court of Appeals has had occasion to speak to many of the issues here involved in a case which has many striking similarities.

Mahaley v. Cuyahoga Metropolitan Housing Authority, 500 F.2d 1087, decided and filed July 9, 1974, was a suit brought by representatives of a class "who by virtue of their poverty or race, or both, (were) unable to secure decent, safe and sanitary housing at rents which they (could) afford." The suit was brought against the Cuyahoga Metropolitan Housing Authority (CHA), certain suburbs of Cleveland, their respective mayors and councilmen and the Department of Housing and Urban Development and its Secretary. Under the United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq., the CMHA had the authority to construct low cost housing in the greater Cleveland area provided that the local government involved agreed. The suit sought to force the local governments named as defendants to enter into cooperation agreements with CMHA so that low cost housing could be constructed in those municipalities on the grounds that these municipalities used this consent requirement as a "tool to perpetuate segregation in violation of 42 U.S.C. § 1983." (Id., page 1089).

Although the issue may well be moot in view of the ruling herein, it is of great interest to note the language of the Court, page 1092, regarding the status of individual councilmen, particularly since, as has been stated earlier, the council vote on the repealing ordinance occurred only after passage of the referendum and an order of mandamus from a state court:

"In oral argument one of counsel for appellees even went so far as to suggest that the single Judge could order individual councilmen to vote for a cooperation agreement. While this course of action might have been a way to order relief without exceeding jurisdictional bounds, we think such action would have been highly improper. Quite simply, it would have been a violation of the separation of powers with the court acting as a legislature. We do not regard city councilmen, mayors, or managers, as state officers."

The Mahaley Court then went on to hold that the failure of the municipalities to consent to a low cost housing project did not prove a violation of the constitutional rights of anyone, relying on Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); Ranjel v. City of Lansing, supra; and Citizens Comm. for Faraday Wood v. Lindsay, 362 F.Supp. 651 (S.D.N.Y. 1973).

As to Palmer, the Court said:

"In Palmer v. Thompson, 403 U.S. 217, [91 S.Ct. 1940, 29 L.Ed.2d 438] (1971), the city of Jackson, Mississippi, decided to cease operation of segregated municipal swimming pools that it had been operating. The Supreme Court found there was clearly state action in the closing of the pools, but could find no denial of equal protection of the law. The Court held that a neutral policy which had a greater impact on a minority was not invalid on that basis.

The minority groups in Palmer relied heavily on the motives of those who closed the swimming pools; however, the Supreme Court was willing to look only to the impact of the action taken, not to motives.

In the present case the failure of the suburbs to provide low-rent housing affected alike both low-income blacks and whites. There may have been a greater impact on the blacks, but that, under Palmer, it is not sufficient to establish a constitutional violation."

██ The inquiry in this case does not end there, of course, for, as pointed out by the Mahaley Court, state action

may still be considered constitutionally impermissible where it is found that the "discriminatory effect results from a prior pattern or practice of discrimination." (Page 1094 of 500 F.2d, citing Citizens Comm. for Faraday Wood).

But one must guard against an oversimplification of that latter phrase, particularly when dealing, as we are, with vague terms such as "encouragement," "motivation," and "psychological impact" as we do here. In *Palmer, supra*, for example, the Court dealt with the "historical context" of Jackson, Mississippi, and acknowledged that Jackson had at one time provided *only* segregated swimming pools. The closing of the integrated municipal swimming pools was not found, however, to constitute a violation of the Thirteenth and Fourteenth Amendments. In discussing *Reitman, supra*, in the *Palmer* case, the Court forcefully emphasizes that the California Amendment *"establish(ed)* the right of private persons to discriminate on racial grounds in real estate transactions." (Emphasis supplied). This is a far cry from the case at bar which relies on the unformable "encouragement" by the municipality to its citizens that they can discriminate with impunity. For in *Palmer, supra*, it is noted that plaintiffs therein claimed that the closing of the public pools authorized or encouraged private pool owners to discriminate on account of race, contrary to the holding of Reitman v. Mulkey, *supra*. However, the Court declined to accept that argument, emphasizing that *Reitman* found that:

". . . the constitutional amendment was an official authorization of racial discrimination which significantly involved the State in the discriminatory acts of private parties."

Moreover, it must be re-emphasized that the NDP project involved here involved *relocation* housing, and did not concern itself with new or additional housing. Thus, it is apparent that the plaintiffs here are attacking a "climate" or "atmosphere" of alleged discrimination. Such an attack must have some firmer basis, especially when it is sought to set aside a referendum neutral on its face and in its legal effect.

A closer analogy is presented by the case of James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1970), which involved a California constitutional provision permitting a referendum on low-rent housing projects within a municipality. The Court, through Justice Black, held that the referendum provision was not violative of equal protection rights and said, pages 142–143, 91 S.Ct. page 1334:

"The people of California have also decided by their own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community. This procedure for democratic decisionmaking does not violate the constitutional command that no State shall deny to any person 'the equal protection of the laws.'"

Finding, as the Court has, no invidious discrimination in the referendum and its effect, the Court finds no violation of the Fourteenth Amendment by any of the municipal defendants here.

*42 U.S.C. §§ 1982, 1983, 3601 et seq.*

■ Since the Court has found that the referendum did not deprive plaintiffs of any constitutional rights the Court cannot find any violation of 42 U.S.C. § 1983. Similarly, the Court can find no violation of 42 U.S.C. § 1982 in the referendum here. The acts repealed had no relation to the rights of citizens to "inherit, purchase, lease, sell, hold, and convey real and personal property," nor does their repeal "authorize private discrimination." Further, as stated *supra*, the Court has found that encouragement of discrimination has not been shown, and has not been received by the

Courts as a basis for challenge of an otherwise neutral legislative act. Spaulding v. Blair, 403 F.2d 862 (4th Cir. 1968). (As to jurisdiction over the municipal entity, see *Mahaley, supra,* 500 F.2d page 1092).

■ The claims under the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. are: 1) an alleged violation of 42 U.S.C. § 3604, which, *inter alia* makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race . . ." and; 2) an alleged violation of 42 U.S.C. § 3617 which makes it unlawful to "coerce, intimidate, threaten, or interfere with any person" in the exercise of rights under § 3604. As to the claim under § 3617, no evidence of any coercive effect upon blacks was presented, except the testimony of Dr. Bauder (discussed *supra*) which was so qualified as to be not probative. As to the § 3604 claim, even if § 3604 is given an expansive reading as urged by plaintiffs, none of the cited cases would impose liability for so indirect a deprivation of housing as is alleged to exist here by *encouragement* of private discrimination. Furthermore, the termination of NDP did not deny any housing to these plaintiffs. The same lack of proof of effect permeates this claim as it does the constitutional claims, and, in short the allegations and proofs here support no cause of action under § 3604. Cf. *SASSO, Id.*

The Court considers it most appropriate, however, to include at this point a highly cogent footnote of the *Mahaley* case, *supra*, since it illustrates the challenge of our society and demonstrates forcefully the grave concern of that and this Court in resolving this serious, debilitating conflict in our nation:

> "The first sentence in the dissent reads:
>
> > 'This case is a civil rights case attacking the growing evil of apartheid in urban America.'
>
> Under our constitutional form of Government no such evil can ever exist in America.

We think, however, that the remedy for social change lies with Congress rather than with the courts. We have no discretion but to obey all valid laws enacted by Congress, and to follow all applicable decisions of the Supreme Court." (Page 1094).

### Claims Against the Federal Defendant

Plaintiffs' action against the federal defendants is based not upon the referendum of November 3, 1970, but upon the "unrestricted flow of FHA insurance" into Warren despite alleged housing discrimination in Warren. The claim of discrimination is based upon the same acts discussed *supra*, in the claims against the municipal defendants. Plaintiffs allege that this "unrestricted flow:" 1) constitutes impermissible government involvement with private discrimination in violation of the Fifth Amendment; 2) does not meet the "affirmative obligation to promote open housing" imposed upon HUD by 42 U.S.C. §§ 3608(c) and 3608(d)(5); 3) does not remedy the effects of alleged past discrimination in the FHA insurance program. The relief requested is that "the flow of FHA insurance to the City of Warren . . . not continue without restrictions to insure homes receiving assistance are sold on a nondiscriminatory basis."

■ The Fifth Amendment claim, founded in particular upon Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971) and Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) is based upon the principle, asserted by plaintiffs, that:

> "The government, state or federal, cannot knowingly participate in discriminatory acts of third parties . . . unless the government 'affirmatively insures' discrimination will be overcome." (Plaintiff's Brief 35).

This claim fails in three respects: 1) the failure to consider the affirmative steps provided by 24 C.F.R. Ch. 2, *infra;* 2) the paucity of the record with re-

spect to FHA practices; 3) a similar paucity of evidence of widespread housing discrimination in Warren.

The conditions for the provision of FHA funds provided by 24 C.F.R., Ch. 2, discussed more fully, *infra,* undercut plaintiffs' argument that the defendants have taken no steps to combat discrimination in the sale of homes subject to FHA mortgages. Further, the existence of these conditions is designed to insure that the state will not be a partner in discriminatory acts, and rebuts plaintiffs' claim in that regard.

The sparse record regarding FHA practices and procedures renders the government's asserted role in discrimination speculative, and is likewise insufficient to support the Fifth Amendment claim. As *Burton, supra* dictates, a "sifting" of facts is essential to discover a non-obvious involvement of the state in discrimination. Here no such facts are before the Court to show that FHA practices make the federal government a "partner" in discrimination in the sense of *Burton.* The suggestion of plaintiffs that FHA aids sellers, proffered by citing the federal government's brief in another case, is not evidence before this Court, and illustrates the inadequacy of the record in this regard.

The evidence of private discrimination in Warren is similarly limited, as previously noted, and also undercuts plaintiffs' claim. While the cases cited by plaintiffs involve proven discrimination by defined institutions (e. g. housing authorities, a labor union, a school system), the proofs here at best show discrimination by an unspecified and limited number of realtors within an area. The curtailment of funds to the entire City of Warren on such proof would be unwarranted and inappropriate since other recourse is available against the individuals who discriminate via the courts, the Michigan Civil Rights Commission (M.C.L.A. § 564.401 et seq.), or the HUD regulations, *supra.* Such relief is also unjustified by the cited cases, as illustrated by the Court's state-

ment in *Gautreaux, supra,* 448 F.2d at 740:

"We state *only* that the Secretary must be adjudged liable on the particular facts and again point out that our holding should not be construed as granting a broad license for interference with the programs and actions of an already beleaguered federal agency."

42 U.S.C. § 3608(c) and 3608(d)(5) provide that "all executive departments and agencies" as well as the Secretary of Housing and Urban Development, "shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter . . . " Section 3601 of the same subchapter declares:

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."

Plaintiffs claim that the federal defendants are not doing "as much as possible" to fulfill this mandate insofar as FHA funds are concerned, and that HUD must curtail or place further conditions upon FHA fund use in Warren. This claim is rebutted, however: 1) by the existing regulations of HUD which prohibit "discriminatory practices" by anyone "doing business with the Federal Housing Administration" or "receiving the benefits" of FHA mortgage insurance (24 C.F.R., Ch. 2, Subpart I, §§ 200.300–200.355); 2) by the administrative discretion accorded to the Secretary of HUD; 3) by the weakness of the evidence of discrimination, discussed *supra.*

Plaintiffs cite Otero v. New York City Housing Authority, 484 F.2d 1122 (2nd Cir. 1973) for the proposition that "action (by agencies) must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns . . . " *Id.* at 1134. The Court in *Otero* went on to say, however, that the general standard which it would

normally apply in reviewing the Housing Authority's discharge of its duty to integrate would be "the normal standard of review . . . that its administrative decision could be reversed only for abuse of discretion or clear error, judgment (sic). Hanly v. Kleindienst, 471 F.2d 823 (2nd Cir. 1972)." *Id.* at 1135. Shannon v. Department of Housing and Urban Development, 436 F.2d 809, 819 (3rd Cir. 1970), cited by plaintiffs, also recognizes that the Secretary has "broad discretion" in choosing methods to achieve national housing goals.

The regulations of 24 C.F.R., Ch. 2, cited *supra* represents a rational means of effectuating the affirmative fair housing duty of HUD. These regulations not only prohibit discriminatory practices, but they provide enforcement mechanisms to deal with violators. The Court notes that plaintiffs have made no reference to these regulations nor any showing that they constitute an abuse of the Secretary's discretion recognized in *Otero* and *Shannon, supra.*

■ In light of the foregoing and in light of the fact that there has been no convincing showing that widespread discrimination in the sale of housing exists in Warren, the Court finds that HUD has discharged its affirmative duty under 42 U.S.C. § 3608.

■ The claim of failure to remedy the effect of past discrimination in FHA practices is based upon the national policies of FHA which plaintiffs' expert witness, Martin Sloane, conceded ended more than twenty years ago. There was no showing of the present effect of past FHA practices in Warren, and no showing that the present FHA practices of HUD, as conditioned by the regulations cited *supra*, have been or will be inadequate to combat any such pernicious effects. The latter showing was a prerequisite to the grant of affirmative relief in the cited cases (e. g. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)), which are otherwise inapposite. Further, there was no showing that the relief sought would counteract the alleged effects. In such a case the passage from *Gautreaux, supra,* has forced, and this Court cannot grant the relief sought.

### Conclusion

In conclusion it deserves note that the plaintiffs were given every opportunity to detail their case against the defendants. While they presented testimony which included evidence of reprehensible acts of private discrimination occurring before the referendum here at issue, they adduced no real proof of an actual injury resulting from that referendum. Just as the Court did not take plaintiffs' claims lightly, so it cannot lightly impose liability for alleged constitutional or statutory injuries.

This Court is not so naive as to believe that private discrimination does not occur in the housing market of the Detroit Metropolitan Area. And it decries that climate and atmosphere the plaintiffs condemn. However, the Court is required to decide the case on its own merits, applying precedential and statutory guidelines and mandates. But it must be stressed again, that this decision is necessarily limited by the facts adduced in this case and by its authority under applicable law.

As was alluded to earlier, the plaintiffs based their housing discrimination suit against a suburb of the Metropolitan Detroit Area on a Neighborhood Development Program that was by definition highly limited in its scope. This is not a flexible enough springboard to launch an admittedly salutary battle against "climates," "atmospheres" and "attitudes" of racial discrimination. But the proffered evidence does not contain that quantity and quality that would permit the Court to find by a preponderance of the evidence (See Marr v. Rife, 6 Cir., 503 F.2d 735, Decided and filed September 26, 1974) that the municipality was engaged in a pattern of discrimination, or that it became significantly involved in encouraging private discrimination.

It takes no great measure of prescience to recognize that housing discrimination will present grave and harmful consequences if allowed to continue. With that knowledge, it is imperative that citizens of all races press strenuously for equality and unrestricted opportunity in every economic, political and racial area, including the institution of legal action whenever there is a reasonable basis for a claim that a fundamental right has been violated. The vigilance of the plaintiffs is to be commended on that score and, it is hoped, will have a beneficial and progressive effect in the struggle to eradicate discrimination.

Judgment may enter in accordance with the foregoing.