Stephen G. RUDISILL and Gail P. Rudisill, Plaintiffs,

v.

Ruth S. FLYNN, Frank Angelotti, Jackqueline Angelotti and Ralph Huszagh, Defendants.

No. 78 C 1764.

United States District Court, N. D. Illinois, E. D.

May 31, 1979.

Stephen G. Rudisill, Chicago, Ill., for plaintiffs.

Thomas H. Neuckranz, Jacobs, Williams & Montgomery, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This litigation concerns the validity of a bond referendum held by the Lake County Village of Kildeer.[1] The central question

---

1. Constitutional challenges to elections or election procedures have frequently been brought in this district. *See, e.g., Illinois State Bd. of Elections v. Socialist Workers,* —— U.S. ——, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Baum v. Lunding,* 535 F.2d 1016 (7th Cir. 1976); *Smith v. Cherry,* 489 F.2d 1098, *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970); *Weisberg v. Powell,* 417 F.2d 388 (7th Cir.

presented on defendants' motion to dismiss is whether the equal protection and due process rights of voters and taxpayers are violated when local government officials intentionally misrepresent and withhold facts bearing on the merits of a public works project in order to win referendum approval for its financing. For the reasons discussed below, the court answers the question in the negative and grants defendants' motion to dismiss for failure to state a claim on which relief can be granted.

The background of this suit is as follows, factual allegations in the amended complaint being taken as true for the purpose of this ruling. Plaintiffs Stephen G. Rudisill and Gail P. Rudisill reside, pay taxes and own property in Kildeer. Both voted in the bond referendum. Defendant Ruth S. Flynn is president and former clerk of the village. Defendants Frank Angelotti and Ralph Huszagh are village trustees. Angelotti owns a business, Applied Engineering, which sells engineering services including the design of sanitary sewer systems. Huszagh holds a beneficial interest in a large tract of undeveloped land owned by his mother and located in Kildeer. Defendant Jackqueline Angelotti is a former village trustee and the wife of Frank Angelotti.

Acting as village trustees between 1973 and 1976, the Angelottis and Huszagh are said to have falsely described Kildeer's need and its residents' desire for a sanitary sewer system to the village board of trustees, the Northeastern Illinois Planning Commission, the Illinois Environmental Protection Agency, and the Lake County Department of Public Works. These misrepresentations were allegedly motivated by the Angelottis' desire to have Applied Engineering obtain the engineering contract for the proposed system, and by Huszagh's desire to create opportunities for residential development of his mother's land. Based upon these misrepresentations, the Lake County Department of Public Works applied for and the Illinois Environmental Protection Agency offered state funding totalling more than $1,750,000, which amounted to seventy-five percent of costs associated with the design and construction of a sewer system for Kildeer.

In late 1976 and early 1977, the four defendants "induced" the village board of trustees[2] to order a public referendum on the question of whether the village should be authorized to issue bonds in the amount of $750,000 to pay the remaining twenty-five percent of the cost of designing and constructing a sewer system. Before and after the board set the referendum, the defendants allegedly conspired to deceive the villagers as to the merits of the project they were being asked to approve.[3] As part of their campaign efforts, defendants disseminated leaflets containing misrepresentations and omitting material facts to all residents under color of the board of trustees' authority at a time calculated to be so near the referendum date that voters would not have an opportunity to learn of the deception. These alleged schemes "to panic

---

1969); *Ury v. Santee*, 303 F.Supp. 119 (N.D.Ill. 1969).

2. The pleadings and memoranda before the court do not indicate how many persons in addition to defendants Angelotti and Huszagh sat on the board, or whether defendant Flynn, after becoming village president, had voting powers on the board.

3. The complaint specifically alleges that defendants "in order to achieve personal and financial gain at the expense of the Plaintiffs' and other Village residents' rights of equal protection and due process" overtly misrepresented

 (i) the need for a sanitary sewer system in the Village of Kildeer,

 (ii) the cost of such a system to the residents of the Village,

 (iii) alleged deadlines and other limitations on the availability of government funds for the design and construction of such a sewer system, and

 (iv) the obligation of the village residents to hook-up to such a sewer system and to bear the cost of such hook-up . . .

As regards defendants' assertion that the complaint in this and other sections fails to set forth detailed facts supporting plaintiffs' allegations, the court believes the pleadings adequately notify defendants of plaintiffs' claims and the grounds on which they rest. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

and mislead voters" are said to have been responsible for the referendum's passage by twelve votes on May 14, 1977. Although no work has begun on the sewer system, defendants Flynn, Frank Angelotti, and Huszagh are said to be continuing to work toward its authorization, design and financing pursuant to the authority conferred by the referendum.

■ Counts I and II of the complaint assert that defendants' alleged misconduct gives rise to a cause of action under 42 U.S.C. §§ 1983 and 1985(3). Count III pleads a deprivation of the federal constitutional rights of equal protection and due process. As to these counts, jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343. Count IV is a pendent claim under Article I, §§ 2, 17 and 18 of the Illinois Constitution. Plaintiffs seek declaratory and injunctive relief including invalidation of the bond referendum, punitive damages, costs and attorney's fees. As deprivation of a constitutionally protected right is a necessary ingredient in causes of action under sections 1983 and 1985,[4] and there is no independent ground for jurisdiction over the state claim,[5] the viability of the suit in this forum turns on the merits of plaintiffs' contention that their fourteenth amendment rights have been violated.

### Equal Protection

Plaintiffs' equal protection arguments focus on certain acts of the defendants which are said to have tainted the outcome of the May 14, 1977 bond referendum. Plaintiffs do not allege that they were physically "hindered in their right to cast ballots" while other residents voted unhampered, *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill. 1969), or that their votes were not counted while others were. *Griffin v. Burns,* 570 F.2d 1065 (1st Cir. 1978). The accuracy of the tabulation is not challenged.[6] Rather, plaintiffs rely on precedents holding that discriminatory denial of equal protection of the law results when deception deprives certain groups of voters of "an equal opportunity to win votes," *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968) or unequally burdens their right to "cast their votes effectively", *id.* at 30, 89 S.Ct. 5, or subjects them to a "discriminatory design favoring a particular group against others," *Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir. 1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

■ Beyond doubt, the equal protection clause secures from invidious official discrimination the voter's interest in government of equal effectiveness with other voters. *Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Voting in local elections and referenda qualifies for constitutional protection. *Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1969); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). However, the authorities cited

---

4. The allegations of the complaint sufficiently establish the first requisite to such suits: state or local officials acting pursuant to their duties are acting "under color of state law" for the purposes of the Civil Rights Act. *McNeese v. Bd. of Educ. for Community Unit School Dist. 187,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Yarborough v. Warren,* 383 F.Supp. 676 (E.D.Mich.1974) and *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill.1969) (conduct of a referendum by local government officials).

5. See *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1968).

6. For this reason, defendants' suggestion that plaintiffs should have contested the referendum by bringing a state court action pursuant to Ill.Rev.Stat. ch. 46, § 23–24 is without merit. Only the result of an election as determined by the returns or ballot count, and not the validity of the election, may be challenged thereunder. *Coalition for Political Honesty v. State Bd. of Elections,* 65 Ill.2d 453, 463, 3 Ill.Dec. 728, 733, 359 N.E.2d 138, 143 (1976) (citing cases); 17 Ill. Law & Prac. § 101. "Qualifications of the candidate . . . or a testing of the validity of an election . . . are matters left to an action in *quo warranto* (Ill.Rev.Stat.1967, ch. 112, par. 9 *et seq.*)." *Black v. Termunde,* 14 Ill.App.3d 937, 940, 303 N.E.2d 803, 805 (1st Dist. 1973). It has not been suggested nor is it clear that plaintiffs could have sought *quo warranto* relief on these facts.

by plaintiffs do not support a holding that the facts alleged describe an instance of discrimination within the meaning of the fourteenth amendment.

■ "The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action." *Briscoe v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970). The classification alleged here does not relate to race, ethnic background, geographical location, poverty, political beliefs or party affiliation, *see* cases cited at *id.*, but instead is said to resemble a classification deemed unlawful in *Smith v. Cherry*. In that case, plaintiffs pleaded that Cherry was a bogus candidate who opposed Smith in the Democratic primary for state senate without intending to run in the general election but rather to withdraw after capturing the nomination so as to allow the Democratic Senatorial Committee to appoint another candidate, Palmer. Thus the nominee was selected not by voters in the primary but by the party committeemen. The Seventh Circuit found a colorable claim that the defendant public officials had conspired to discriminate among three groups of voters: (1) "Organization Voters" or "INS" who would have voted for either Cherry or the substituted Palmer, (2) "Swing Voters" who would have voted for Cherry but not for Palmer, and (3) "Smith Voters" or "OUTS" who would have voted for Smith as against either Cherry or Palmer. 489 F.2d at 1102. The court described the nature of the discrimination as follows: ·

> Organization Voters and Swing Voters were both "tricked" into voting for Palmer when they thought they were voting for Cherry. *But the impact of this deception fell unequally on the two groups of voters, because the Organization Voters would have voted for Palmer anyway, whereas the Swing Voters would have voted against him.*

> By deceiving the Swing Voters, the conspiracy allegedly enabled Palmer to win an election he could not have won had he openly been on the ballot. The conspiracy defeated Smith, who allegedly would have won an honest election against Palmer. Thus the conspiracy worked "in favor of the ins and against the outs." *Shakman v. Democratic Organization*, 435 F.2d 267, 270 (7th Cir. 1970). Swing Voters and Smith Voters were "denied an opportunity to win votes" (*Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5 [, 21 L.Ed.2d 24]) and suffered an unequal burden on their right "to cast their votes effectively." *Id.* at 30, 89 S.Ct. 11. The Smith Voters were denied an equal opportunity "to associate for the advancement of political beliefs" with the Swing Voters. *Id.* at 30, 89 S.Ct. at 10. These claims of deliberate discrimination against Swing Voters and Smith Voters stated a cause of action for violation of rights protected by the equal protection clause.

*Id.* (emphasis added).

By plaintiffs' analogy, defendants herein deliberately discriminated among (1) Pro-sewer Voters who "would vote for sewer regardless of what facts [were] disclosed to them by Village officials", (2) Swing Voters who "would vote for or against sewer depending on what facts [were] disclosed to them", and (3) Anti-sewer Voters who "would vote against sewer regardless of what facts [were] disclosed to them". Continuing to invoke *Smith v. Cherry*, they assert that "Swing Voters . . . were 'tricked' into voting for the sewer, but the impact of this deception fell on the Anti-sewer Voters as well as the Swing Voters. The vast majority of the electorate might have voted against the sewer if they had not been fraudulently misled and deceived". Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 16.

The two cases do not align so neatly. The three voter categories alleged by the *Smith* plaintiffs and discerned by the court in that case included a bloc of Organization Voters who would unquestionably back any nominee the party slated. Given that identifiable group of people whose votes would not have changed, the court could reason that Cherry's sham candidacy deceived "unequally".

In this case, although they allude to a group of Pro-sewer Voters, plaintiffs have argued in essence that the "vast majority" of the electorate consisted of Swing Voters who if properly informed would have opposed financing for the public works project. They allege that village residents passed the referendum "[a]s a result of this deception." Complaint at 6. It is not clear that there were *any* voters who would have voted for the sewer "regardless," save defendants, who of course were not duped by their own scheme. Absent an identifiable group of individuals who would have voted "yes" on the referendum question regardless of defendants' misrepresentations, it must be concluded that the impact of the deception fell without discrimination among voters who were misled.

The court agrees with plaintiffs that whether they voted for or against the sewer system is irrelevant. If they were deceived, then unlike Swing Voters in *Smith v. Cherry*, they were deceived "equally" with other credulous voters. If they were not deceived, then—in sharp contrast to the Smith supporters who campaigned unaware of and powerless to discover the Cherry ruse—plaintiffs using normal democratic processes could have publicized the "true" state of affairs to edify Swing Voters and to "associate [with them] for the advancement of political beliefs." *Williams v.*

*Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).[7]

## Due Process

Although the complaint and supporting memorandum dwell on matters which postdated the referendum,[8] the gist of plaintiffs' due process claim is that [defendants'] fraud effectively denied the electorate a fair opportunity to vote." Plaintiffs' Mem. at 8–9.[9]

 The fourteenth amendment due process clause, besides according procedural safeguards to protected interests, "likewise protects substantive aspects of liberty against impermissible governmental restrictions." *Harrah Independent School District v. Martin,* —— U.S. ——, 99 S.Ct. 1062, 1063, 59 L.Ed.2d 248 (1979). The concept of "liberty" protected against state impairment includes the right to vote, *United States v. Saylor,* 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975); *O'Neal v. Gresham,* 519 F.2d 803 (4th Cir. 1975), and "due process is implicated where the entire election process . . . fails on its face to afford fundamental fairness." *Griffin v. Burns,* 570 F.2d 1065, 1078 (1st Cir. 1978). Plaintiffs have argued strenuously the general language of cases such as *Hennings* condemning "wilful conduct which undermines the organic processes by which candi-

**7.** In this connection it bears noting that several months intervened between the time the defendants allegedly induced the village board of trustees to authorize the bond referendum and the poll date, and that approval was by only 12 votes.

**8.** For example, plaintiffs state that after the referendum, village president Flynn appointed Frank Angelotti and Huszagh to a committee to select an engineering firm to design the sewer system, knowing of their personal interests in the project. Angelotti subsequently resigned from the committee and proceeded to bid for the contract through his firm Applied Engineering. Unsealed bids were submitted to the committee at a meeting in Flynn's home. The contract was not awarded to Applied Engineering, although Huszagh voted to select Angelotti's firm.

Plaintiffs also relate that in spring of 1978, 85 percent of Kildeer's residents of voting age signed a petition opposing the extension of san-

itary sewers in Kildeer and asking the village not to authorize further expenditures or to issue bonds in connection with the project. The village board of trustees allegedly ignored this communication. It is further alleged that defendant Flynn has "continued the pattern of misrepresentations" regarding the sewer system in her dealings with the Illinois Environmental Protection Agency.

These contentions go to the question of fraudulent intent but, assuming defendants' bad faith for present purposes, do not assist in determining whether defendants' conduct up to May 14, 1977 effectively disenfranchised plaintiffs.

**9.** Plaintiffs have not argued that the referendum was itself *procedurally* defective. Neither the complaint nor the supporting memorandum, as the court reads them, avers a violation of procedural due process.

dates are elected." 523 F.2d at 864. But tellingly, they have not cited and this court's research has not found any precedent for a holding that false statements of legislators on a public issue violated the due process rights of persons whose votes were influenced by those statements, much less the rights of voters who discredited them. If Kildeer electors encountered deception, it was not a "deception on the face of the ballot," unbeknownst to them, like the bogus candidate involved in *Smith v. Cherry*, 489 F.2d at 1102. The referendum ballots posed a plain yes or no choice concerning $750,000 of bond financing. If there was deception here, it was deception traceable in part to the voters' own failure to inform themselves about the proposition at hand.[10] A claim for deprivation of due process has not been stated.[11]

For the reasons discussed above, defendants' motion to dismiss the federal counts in this action for failure to state a claim will be granted. In light of the recency of the events in question and the absence of facts suggesting the claim under the Illinois Constitution might be timebarred or otherwise untriable in a more appropriate state forum, the pendent court will be dismissed, as well.[12] *See O'Brien v. Continental Illinois*

*National Bank & Trust Co. of Chicago*, 593 F.2d 54 (7th Cir. 1979).

**10.** There are no specific allegations that defendants *prior to the referendum* prevented plaintiffs from attending public meetings or viewing public documents or otherwise denied them access to sources of information pertinent to the sewer system proposal.

**11.** Although this case does not present a "political question," *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and although the reach of that doctrine has narrowed over the years, *see generally* 6 Moore's Federal Practice ¶ 57.14 (2d ed.), still the observation of Mr. Justice Frankfurter seems pertinent that "[t]he Constitution has left the performance of many duties in our governmental scheme to depend [upon] the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946). The Supreme Court quoted Mr. Justice Frankfurter's views on another facet of our scheme of government in its recent holding that federal, state and regional legislators are absolutely immune from federal damage liability for actions taken in their legislative capacities. *Lake*

*Country Estates, Inc. v. Tahoe Regional Planning Agency*, —— U.S. ——, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979). *Lake Country Estates* specifically reserved the question of whether such immunity extends to individuals performing legislative functions at the purely local level. *Id.* at n.26. The decision would nonetheless tend to bolster some aspects of defendants' claim, raised but unnecessary to resolve here, that their conduct falls within the civil immunity to public officials, particularly since they, unlike the appointees in *Lake Country Estates*, are elected officials directly accountable to the public for their legislative acts. *See id.* at 99 S.Ct. at 1180 (Marshall, J., dissenting in part).

**12.** Sections 17 and 18 of Art. I of the Illinois Constitution proscribe discrimination in employment and the sale or rental of property and discrimination on the basis of sex, respectively. The applicability of these sections to the facts upon which plaintiffs base their complaint seems doubtful.