CLIENTS' COUNCIL; Debra Wyatt; and Merlene McGloughlin

v.

Samuel R. PIERCE, Jr., Secretary of the Department of Housing and Urban Development; Thomas Armstrong, Regional Administrator, Region Six, Department of Housing and Urban Development; Andrew Watts, Area Manager, Department of Housing and Urban Development.

No. 79–4086.

United States District Court, W. D. Arkansas, Texarkana Division.

Feb. 1, 1982.

John Buckley, David J. Manley, East Texas Legal Services, Texarkana, Tex., Michael M. Daniel and Elizabeth K. Julian, Dallas, Tex., for plaintiffs.

David Folsom, Young, Patton & Folsom, Texarkana, Ark., and Henry I. LaHaie, U. S. Dept. of Justice, Civil Division, Washington, D. C., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

The instant suit involves a charge of race discrimination brought by individuals and an unincorporated group against the Secretary of the Department of Housing and Urban Development (HUD) and certain HUD administrators. The plaintiffs are low income minorities who are eligible for public housing. The Texarkana, Arkansas, Housing Authority (THA) and its Board of Commissioners were originally defendants, but have reached a settlement with plaintiffs and, therefore, the suit against them was dismissed. The remaining defendants shall be collectively termed "HUD" or "the federal defendants."

Plaintiffs contend that HUD has knowingly supported a public housing authority which has engaged in racially discriminatory practices, in violation of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968 and the fifth amendment to the Constitution of the United States. Plaintiffs failed to file a Motion for Class Certification within the time prescribed by the local rules; therefore, the action is brought only by the named plaintiffs.

The Court must now decide this case without a trial since the parties agreed to submit it for decision based on the administrative record. Said record is 914 pages long. The Court has reviewed the entire record.

The THA operates nine low income housing projects. It is clear from the record that the residents of these projects have been assigned to their apartments according to race. Three of the projects—Ozan Courts, Carver and George Johnson Homes—are populated exclusively by black people. Until recently, Highpoint, Hacota I and Ingram were populated exclusively by white people. (R. 44) Furthermore, those projects which were integrated still had residents assigned to a certain area based on race, resulting in "white areas" and "black areas" within the projects.

Plaintiffs filed a Motion for Summary Judgment, renewing their contention that the federal defendants violated Title VI, Title VIII and the fifth amendment by failing "to take effective affirmative action to end racial segregation in the operation of defendant Housing Authority."

Defendants have also filed a Motion for Summary Judgment.

■ Under Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968, HUD has a duty to administer its housing programs and activities in a manner that furthers policies of nondiscrimination. Pursuant to those statutory mandates, HUD has issued regulations to prohibit discrimination and to promote fair housing, including anti-discrimination regulations governing all HUD assistance programs. 24 C.F.R. §§ 1.1, et seq.; §§ 2.1, et seq.; regulations allowing administrative complaints from persons who claim to have been injured by discriminatory housing practices, 24 C.F.R. §§ 105.-1, et seq.; §§ 200.300, et seq.: site selection regulations, 24 C.F.R. §§ 200.700, et seq.; § 800.209; § 880.206; tenant selection regulations, 24 C.F.R. §§ 860.203, 880.603; and affirmative marketing regulations, 24 C.F.R. §§ 108.05, et seq.; §§ 200.600, et seq. The agency implements these regula-

tions primarily by way of Title VI compliance reviews and Title VI/Title VIII complaint investigations.

With respect to the THA, HUD has conducted several reviews and investigations over the past several years. During the most recent review, completed in August 1978, HUD found THA to be in noncompliance with Title VI because of its racially segregated projects, its tenant assignment practices and its failure to appoint a black person to its Board of Commissioners. (R. 4–5) As a result of that finding, THA entered into a compliance agreement with the agency to rectify those shortcomings. (R. 33–34; 26–32) The Housing Authority also agreed to submit to periodic reports to HUD detailing its progress in implementing the compliance agreement. (R. 33)

Because THA failed to submit those periodic reports, HUD conducted a follow-up review in September 1979. (R. 346–348) Although that review indicated that THA was making some progress in carrying out the compliance agreement (R. 409), HUD ultimately determined that the housing projects were still being administered in noncompliance with Title VI. (R. 410–412) THA then submitted updated data which it contended demonstrated a good faith effort to implement the compliance agreement. (R. 413–422)

▮ Two weeks later, HUD conducted another on-site review. (R. 425–518) The results of that review were communicated to HUD's Assistant Secretary for Fair Housing and Equal Employment Opportunity who, in turn, indicated that if voluntary compliance was not secured from THA, the Department would initiate enforcement by way of realignment as a party plaintiff in this case. (R. 423) However, HUD does not have authority to bring affirmative suits under either Title VI or Title VIII. Only the Civil Rights Division of the Justice Department has such authority. 42 U.S.C. § 3613; 28 C.F.R. §§ 0.50(a), 0.51(b).

HUD has attempted in other ways to promote policies of nondiscrimination and fair housing with respect to the City of Texarkana. On August 25, 1978, HUD advised the Mayor of Texarkana that the City was ineligible to participate in the Urban Development Action Grant (UDAG) Program because it failed to provide fair housing to its citizens, especially in the THA's housing projects (on the same date that HUD advised THA that it was in noncompliance with Title VI. (R. 4, 5) HUD recommended, *inter alia*, the following course of action:

The City should initiate actions which it deems appropriate against the local Housing Authority in order to make some progress in the area of Equal Opportunity in housing, and to insure that the housing authority is operated in accordance with Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968. (R. 10)

A year later, HUD again declared the City ineligible to apply for UDAG funds because of the Housing Authority's continued failure to provide equal housing opportunities to minorities. (R. 408)

In addition to the 1978–1980 Title compliance reviews of THA and the denials of UDAG eligibility to the City of Texarkana, HUD recently investigated a Title VIII complaint from a Housing Authority tenant. (R. 519–622) Upon completing the investigation, HUD conciliated the complaint in March 1979 to the satisfaction of the tenant. (R. 631–633)

Before 1978, HUD has undertaken several compliance reviews and complaint investigations of THA. The first compliance review occurred in May 1969 and resulted in a finding of noncompliance. Numerous deficiencies were listed and corrective recommendations were outlined by HUD officials to the Housing Authority. (R. 902–909) Subsequently, "agreement was reached [between HUD and THA] on all points of correction." (R. 908) According to subsequent correspondence in the administrative record filed with the Court, the Executive Director of THA sent HUD a letter on July 23, 1969, in which he indicated that the Housing Authority would comply with the recommendations outlined by the agency. (R. 773)

In January 1971, HUD received a complaint from a resident of Texarkana alleging, *inter alia*, that the Housing Authority was assigning units on the basis of race. (R. 756; 761–768; 770–771) Three weeks later, the agency conducted an investigation that substantiated these charges. (R. 773, 774; 777–782) HUD promptly notified THA that it was in noncompliance with Title VI and applicable HUD regulations. (R. 773–776) The agency also indicated that failure to effectuate compliance would jeopardize future contractual agreements with respect to two additional housing projects and a modernization program for an existing project. (R. 774, 776, 791)

Shortly after receiving that notice of noncompliance, THA passed a resolution directing its Executive Director "to immediately implement the recommendations" outlined by HUD. (R. 783–788) HUD then conducted an on-site review which revealed that full compliance had not yet been achieved. (R. 804, 805) Nonetheless, because THA had begun "to implement some of the procedures necessary for compliance with Title VI" (R. 802) and because HUD officials "did not want to continue withholding funds which would materially improve the community," (R. 799), the agency approved contracts for the construction of two more projects and modernization of Ozan Courts, an existing, all-black project. (R. 806, 846)

Subsequently, HUD conducted another on-site review, and the Authority was again found to be in noncompliance. HUD decided, however, to delay further action until the modernization of Ozan Courts was underway, for it viewed this project as an opportunity for THA to integrate the existing units. (R. 809; 4)

In January 1973, HUD conducted a third follow-up compliance review and found that the Housing Authority still had not achieved full compliance with Title VI. (R. 813–815) HUD's Regional Office recommended that any nonmandatory financial assistance to THA be deferred until the agency was able to secure compliance from the Housing Authority. (R. 820)

Shortly thereafter, THA applied for additional funds to complete its continuing modernization program with respect to Ozan Courts, which funds were needed to repair the roofs of the modernized units in the Ozan project. (R. 857–860) HUD conditioned approval of the additional funds upon the Housing Authority agreeing to enter into a compliance agreement designed to correct the deficiencies delineated during the January 1973 review. (R. 829) Attempts to negotiate such an agreement, however, proved futile. (R. 830–834; 840, 841; 846–852) Consequently, HUD deferred release of the additional modernization funds requested by THA.

Several months later, the Housing Authority informed HUD's Little Rock Area Office that the roofs of the modernized Ozan units were leaking so badly that considerable damage was occurring to the projects. THA again requested release of additional money so that the roofs could be repaired. (R. 857) The Area Director summarized the situation to HUD's Regional Administrator, in pertinent part, as follows:

A modernization program of the above project was completed on February 28, 1974, at a total cost of $731,820 ...

The funds allocated for this program were adequate for the program as planned, but during the construction process it was found that the roofs of the single story buildings were developing leaks. However, there were insufficient funds to supply needed roofing for these buildings.

This office has an additional $21,053 under ACC for this modernization program, but because Equal Opportunity in the Region states the Authority has not complied with conciliation agreements, concurrence in the release of these funds is being withheld ...

The roofs on the modernized units continue to leak ... Reroofing is essential if the money spent in the modernization program is to be protected. These roofs are the built-up type, over twenty years old, and continuous water damage because of roof leakage will result in serious damage to the renewed living units.

As indicated in our memo of November 30, 1974, the LHA [local housing authority] is following its MOA [methods of administration] and attached is a letter from the Authority dated April 18, 1974, pointing out the percentage of non-white to white tenants which indicate a good degree of integration, proper handling of applications, housing assignments and offers.

Normally, we would not press an issue of this nature, but there is a $700,000 investment that will deteriorate rapidly if some action is not taken soon. Further, this office feels that, with integrated projects, city wide application registers, a policy of following its MOA, and a willingness of the Authority to give every consideration to a minority member, EO should lift its objection to release of the funds in question. (R. 858, 859)

Shortly thereafter, HUD's Regional Office conducted an on-site review of the projects (R. 858, 859) and, in addition, received separate assurances from THA's Executive Director that corrective action had been taken with respect to fourteen "items of noncompliance." (R. 886–888) Based on that review and those assurances, the Housing Authority was found to be in "substantial compliance with the requirements of Title VI" (R. 896) and thus eligible for the additional modernization funds needed for roof repairs. (R. 898)

In addition to the 1969 compliance review and 1971–1974 complaint investigations, HUD processed two complaints of discrimination in 1975 and 1976 with respect to THA. The first was withdrawn by the complainant before the agency had an opportunity to conduct the investigation. (R. 738–740) The second complaint was investigated by the agency in March 1976. (R. 915–919) When subsequent efforts at conciliation proved unsuccessful, HUD informed the complainant of her right to seek judicial relief. (R. 921; 7) The agency also notified THA that it was initiating a Title VI on-site compliance review of the Housing Authority.

The plaintiffs claim that "HUD's actions and inactions towards the defendant Housing Authority have violated its constitutional duties." (Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 2). To establish such a breach, plaintiffs must prove that HUD officials acted with a racially discriminatory purpose. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–268, 97 S.Ct. 555, 562–565, 50 L.Ed.2d 450 (1976) ("Arlington Heights"); *Washington v. Davis*, 426 U.S. 229, 238–245, 96 S.Ct. 2040, 2046–2050, 48 L.Ed.2d 597 (1976). Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Although disproportionate impact may be probative of racial animus, it is insufficient in itself to support a finding of discriminatory intent. *Arlington Heights*, supra, 429 U.S. at 265, 97 S.Ct. at 563. In short, the constitutional test is "whether there was any action ... which was intended to, and did in fact, discriminate." *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 85 (1977).

Proof of intent may be inferred from various objective factors. As noted by the Court in *Arlington Heights, supra*, these include: (1) the discriminatory "impact of the official action—'whether it bears more heavily on one race than another'"; (2) "the historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes"; (3) the "sequence of events leading up to the challenged decision"; (4) "departures from the normal procedural sequence"; (5) substantive departures from the norm"; and (6) "the legislative or administrative history ... especially where there are contemporary statements by the decisionmaking body." 429 U.S. at 266–268, 97 S.Ct. at 564.

■ The administrative record in this case demonstrates that the federal defendants consistently attempted to promote nondiscrimination and fair housing on behalf of all minorities in Texarkana. That HUD's success was apparently not as quick as plaintiffs would wish does not prove that the agency intentionally discriminated against them.

■ Because proof of discriminatory intent is absent in this case, plaintiffs have no fifth amendment claim against the federal defendants. *Washington v. Davis*, supra, 426 U.S. at 244, 245, 96 S.Ct. at 2049; *Arlington Heights, supra*, 429 U.S. at 264–268, 97 S.Ct. at 562–565.

■ Spurred by a recent Supreme Court decision, courts have reached the conclusion that Title VI does not create a private right of action against a federal funding agency. The leading court of appeals decision is *NAACP v. Medical Center*, 599 F.2d 1247 (3d Cir. 1979) (*"Medical Center"*), wherein the Court held that although section 601 of the Act creates a private right of action against recipients of federal funding, it does not create such a right against federal agencies.

Section 601, 42 U.S.C. § 2000d, provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Section 602, 42 U.S.C. § 2000d–1, provides, in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of section 601 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability ... Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of ... assistance under such *program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement ... or (2) by any other means authorized by law: Provided, however, that no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating ... assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the ... House and Senate ... a full written report of the circumstances and the ground for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.*

(Emphasis in the original).

Acknowledging that a beneficiary may, within the legislative scheme of Title VI, trigger an agency investigation of a recipient under section 602, the Court in *Medical Center, supra*, nevertheless concluded:

But a beneficiary may not otherwise sue an agency under section 601 to compel termination of funds. Additionally, we now hold that a beneficiary may sue a recipient of federal funding under section 601 for a judicial declaration that the recipient's conduct is in violation of section 601. Such an action would allow the beneficiary to vindicate his section 601 rights without invoking the executive's power to terminate funds. (If the trial court finds that the recipient is violating section 601, it may order the recipient to cease the discriminatory practice. Alternatively, the recipient may decline federal funding and escape Title VI's jurisdictional predicate.)

It follows that *the beneficiary may not sue the administrative agency under section 601.* If the beneficiary were allowed to do so, it would be able to circumvent to limitations of sections 602 and 603, and

would be in a position to, in essence, compel funding termination—which is an impermissible result. This conclusion is in harmony with our analysis of the legislative scheme. It does no harm to beneficiaries' rights, as complete relief can be awarded without the agency being a party to the private suit. 599 F.2d at 1254, n. 27.

The Court premised these conclusions upon an analysis of the legislative history of Title VI, which demonstrates that Congress intended termination of federal funding to be used only as a last resort after all steps in the administrative process, including efforts to secure voluntary compliance, have been exhausted.

The *Medical Center* Court drew precedential support for its decision from the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("*Cannon*"). There, the Court, upon noting that the procedures adopted by HEW under Title IX of the 1972 Educational Amendments did not allow a complainant/beneficiary to participate in administrative investigations or enforcement proceedings, stated:

[An] agency may simply decide not to investigate—a decision that often will be based on a lack of enforcement resources, rather than on any conclusion on the merits of the complaint. In that case, if no private remedy exists, the complainant is relegated to a suit under the Administrative Procedure Act to compel the agency to investigate and cut off funds. *E.g., Adams v. Richardson*, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973). But surely this alternative is far more disruptive of HEW's efforts efficiently to allocate its enforcement resources under Title IX than a private suit against the recipient of federal aid could ever be. 441 U.S. at 707, 99 S.Ct. at 1963.

■ The Supreme Court's analysis in *Cannon* of Title VI's legislative history likewise makes clear that Congress did not envision a private right of action under section 601 against federal agencies. Citing comments by Senator Kenneth Keating in

which he expressed disappointment at the failure of the Kennedy Administration to include a provision for an express private right of action in its proposed bill, the Court explained that the administration's decision not to incorporate such a provision "appears to have been a compromise aimed at protecting individual rights without subjecting the Government to suits." 441 U.S. at 715, 99 S.Ct. at 1967. The Court amplified this explanation in a footnote:

The Keating suggestion was made in the context of broader complaints that the original version of Title VI ... was too weak and too dependent on the fund-cutoff remedy. That version, it should be noted, was not explicitly declarative of any individual right against discrimination. Instead, it merely allowed federal agencies to withhold funds from discriminatory recipients.

The result of the administration's reconsideration of Title VI was a compromise. Although its redraft, which in major part was enacted as Title VI, did not include an express private cause of action either to cut off funds or to end discrimination, it did rephrase § 601 as a declaration of an absolute individual right not to have federal funds spent in aid of discrimination.

There is a plausible reason for this compromise. In its final form, § 601 was far more conducive to implication of a private remedy against a discriminatory recipient than was the original language, but at the same time was arguably *less* conducive to implication of a private remedy against the Government (as well as the recipient) to compel the cutoff of funds. Although willing to extend private rights against discriminatory recipients, the Government may not have been anxious to encourage suits against itself. *Id.* at 715–716, n.51, 99 S.Ct. at 1967, n.51 (Emphasis in original).

■ Moreover, the position that Title VI does not create a private remedy against the Government is buttressed by the legislative intent and the specific structure of the Act. As outlined by the Court in *Cannon*,

*supra*, Congress' intent in enacting Title VI was to accomplish two related but different objectives: first, "it wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." *Id.* at 704, 99 S.Ct. at 1961.

The first objective was served by enactment of section 602, which establishes an elaborate mechanism of enforcement by federal agencies. That provision directs federal funding agencies to implement Title VI and provides that compliance may be effectuated by cutting off federal funds or by "any other means authorized by law;" however, imposition of the funding termination sanction must be preceded in every case by an agency determination that voluntary compliance cannot be secured and by the agency giving Congress at least thirty days' written notice. Additionally, section 603 of the Act provides for judicial review of agency action taken pursuant to section 602. Significantly, because of strong congressional sentiment "in favor of limiting the role of third parties in the funding process," beneficiaries are not included in the compliance mechanism embodied in section 602. *Medical Center*, 599 F.2d at 1254.

The second objective—protection of individuals against discrimination—was achieved by section 601. It creates personal rights by declaring that "no person . . . shall, on the ground of race . . . be subjected to discrimination under any program or activity receiving federal financial assistance." That provision thus instructs recipients of federal funds not to discriminate and by implication grants beneficiaries the right to enforce that mandate. When compared to section 602, it becomes especially clear that section 601 is aimed at the recipients of federal funds, not the agency dispersing those funds. Accordingly, if an individual has been subjected to discrimination under a federally assisted program because of his race, his remedy is against the recipient for declaratory and injunctive relief to end the discriminatory practice. Cf.

*Board of Regents v. Bakke*, 438 U.S. 265, 419, n.26, 98 S.Ct. 2733, 2814, 57 L.Ed.2d 750 (1976) ("*Bakke*"). His remedy is not against the funding agency. Cf. *Coleman v. Darden*, 595 F.2d 533 (10th Cir. 1979), cert. denied, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979).

Lastly, the position that section 601 creates a private remedy against the recipient, not the provider, of federal funds is supported by one of the grounds upon which courts have relied in implying a private right of action under similar civil rights statutes—namely, the great number of federally assisted programs make it unfeasible for executive agencies to be able to detect all violations of the statute or to commence enforcement proceedings every time they detect a violation. *Cannon*, 441 U.S. at 706–708, 99 S.Ct. at 1962; *Allen v. State Board of Elections*, 393 U.S. 544, 556–557, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969). See also, Note, *Implied Rights of Action to Enforce Civil Rights: The Case for a Sympathetic View*, 87 Yale L.J. 1378, 1404–1406 (1978). Thus, it is anomalous for courts, on one hand, to recognize the incapability of federal agencies to enforce Title VI against every recipient of federal funds, yet on the other hand, subject these same agencies to liability under Title VI when they do not do so.

Against this statutory and judicial backdrop, it is clear that Title VI was intended to create a private cause of action only against the recipients of federal funds, and not the federal funding agencies. Notwithstanding *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971) ("*Gautreaux*") and its few progeny," there is nothing in the language or legislative intent of Title VI which suggests that merely providing funds will subject the federal provider to liability under section 601 for mandatory injunctive relief. Rather, Title VI's legislative scheme dictates that a beneficiary's only remedy against the funding agency is a suit under the Administrative Procedure Act to review, and possibly to compel, agency action pursuant to section 602 of the Act. *Cannon*, 441 U.S. at 707, n.41, 99 S.Ct. at 1963,

n. 41; *Medical Center,* 599 F.2d at 1254, n.27. See also *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973); *Brown v. Weinburger,* 417 F.Supp. 1215 (D.D.C.1976). Inasmuch as plaintiffs would have this Court invoke Title VI as a basis for imposing mandatory injunctive relief against HUD requiring special funding allocations in Texarkana, their Title VI claim must be dismissed.

Even if Title VI did create a private remedy against federal agencies, plaintiffs' claim would have to be dismissed because they have not exhausted their administrative remedies before seeking judicial relief. Apparently, exhaustion of administrative remedies is not a prerequisite for private suits against recipients of federal funds. See *Cannon, supra,* 441 U.S. at 706, 708, n. 41, 99 S.Ct. at 1962, n.41; *Medical Center, supra,* 599 F.2d at 1249, n. 6. But cf. *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 157, 158 (E.D.Pa.1977).

██ But nearly every court that has addressed the exhaustion issue with respect to Government agencies has held that plaintiffs must first avail themselves of administrative Title VI procedures before seeking any type of judicial review. *Johnson v. County of Chester,* 413 F.Supp. 1299, 1310–1311 (E.D.Pa.1976); *Green v. Cauthen,* 379 F.Supp. 361, 378–379 (D.S.C.1974); *Feliciano v. Romney,* 363 F.Supp. 656, 672–673 (S.D.N.Y.1973); *Dupree v. City of Chattanooga,* 362 F.Supp. 1136, 1141–1142 (E.D. Tenn.1973). But cf. *Shannon v. HUD,* 436 F.Supp. 809 (3d Cir. 1970). Because plaintiffs admit that they have not exhausted administrative remedies (Plaintiffs' Answers to Federal Defendants' Interrogatories, No. 5), their Title VI cause of action must be dismissed.

██ Even if this Court were to hold that Title VI authorizes a cause of action against federal agencies and that failure to exhaust administrative remedies is not a bar to such an action, plaintiffs cannot prevail, because to prove a Title VI violation, they shoulder the same heavy burden as they carry under the fifth amendment: They must demonstrate purposeful racial discrimination. Plaintiffs have not done so under Title VI for the same reasons they could not do so under the fifth amendment.

Prior to *Board of Regents v. Bakke, supra,* courts held or assumed that a *prima facie* Title VI violation was established upon a showing that the challenged conduct had an adverse effect or impact upon minorities. Proof of intent or motive was not necessary. *E.g., Gautreaux v. Romney, supra,* 448 F.2d at 738. In *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (*"Lau"*), the Supreme Court, upholding a HEW regulation establishing an "effect" or "impact" standard under Title VI, stated:

> Discrimination is barred which has [an adverse] *effect* even though no purposeful design is present: a recipient "may not …. utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination" or have "the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." *Id.* at 568 [94 S.Ct. at 789] (Emphasis in original).

See also, *Board of Education v. Califano,* 584 F.2d 576, 589 (2d Cir. 1978), *aff'd on other grounds sub nom. Board of Education v. Harris,* 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979); *Guadalupe v. Temple Elementary School,* 587 F.2d 1022 (9th Cir. 1978); *Johnson v. City of Arcadia,* 450 F.Supp. 1363 (M.D. Fla. 1978).

Recently, however, courts have read the Opinions in *Bakke* in conjunction with those in *Board of Education v. Harris, supra,* as indicating that *Lau* has been overruled and that the standard of proof for Title VI violations is the same standard the Supreme Court has established for discrimination under the fifth and fourteenth amendments. See, *e.g., Cannon, supra,* 648 F.2d at 1106–1109; *Lora v. Board of Education for City of New York,* 623 F.2d 248, 250 (2d Cir. 1980); *Schmidt v. Boston Housing Authority,* 505 F.Supp. 988, 992–993 (D.Mass.1981); *Valadez v. Graham,* 474 F.Supp. 149, 159 (M.D. Fla. 1979). As outlined by the court

in *Bryan v. Koch*, 492 F.Supp. 212, 229–233 (S.D.N.Y.), *aff'd*, 627 F.2d 612 (2d Cir. 1980), the basis for this conclusion is as follows.

First, in *Bakke*, Justice Powell and Justice Brennan—the latter being joined by Justices White, Marshall and Blackmun—concluded that Title VI incorporates the Constitution's proscription against race discrimination. 438 U.S. at 281–287, 328–355, 98 S.Ct. at 2767. Indeed, Justice Brennan concluded that "Congress intended the meaning of the statute's prohibition to evolve with the interpretation of the commands of the Constitution." *Id.* at 340, 98 S.Ct. at 2773. The potential implications of this analysis on the continued vitality of *Lau* was acknowledged by Justice Brennan:

> We recognize that *Lau*, especially when read in light of our subsequent decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which rejected the general proposition that governmental action is unconstitutional solely because it has a racially disproportionate impact, may be read as being predicated upon the view that, at least under some circumstances, Title VI proscribes conduct which might not be prohibited by the Constitution. Since we are now of the opinion, for the reasons set forth above, that Title VI's standard, applicable alike to public and private recipients of federal funds, is no broader than the Constitution's, we have serious doubts concerning the correctness of what appears to be the premise of that decision.

> 438 U.S. at 352, 98 S.Ct. at 2779.

Second, the Court in *Board of Education v. Harris*, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979)—a case holding that a discriminatory impact standard is applicable under the 1972 Emergency School Aid Act (ESAA)—touched on the test for proving discrimination under Title VI. The majority, while leaving open the question of the applicable Title VI standard, suggestively noted:

> It does make sense to us that Congress might impose a stricter standard under ESAA than under Title VI of the Civil Rights Act of 1964. A violation of Title VI may result in a cutoff of all federal funds, and it is likely that Congress would wish this drastic result only when the discrimination is intentional. *Id.* at 150, 100 S.Ct. at 374.

The dissent, consisting of Justices Stewart, Powell and Rehnquist, thought that an intent standard should be applied even to ESAA. *Id.* at 160, 100 S.Ct. at 380.

■ Thus, against this backdrop of recent judicial decisions, it seems certain that "a violation of Title VI requires an intentional discriminatory act and that disparate impact alone is not sufficient to establish a violation." *Cannon*, 648 F.2d 1104, 1109 (7th Cir. 1981). Inasmuch as the plaintiffs have failed to point to any evidence in the administrative record—nor has the Court been able to divine any evidence—that demonstrates intentional discrimination on the part of HUD officials, they cannot prevail on their Title VI cause of action.

Although not in itself sufficient to support Title VI liability, plaintiffs cannot even show that any action taken by HUD has had a discriminatory impact in Texarkana. To the contrary, the administrative record in this case demonstrates that the federal defendants took numerous actions to obviate the discriminatory effects of THA's housing system. As detailed, *supra*, HUD recently found the Housing Authority to be in noncompliance with Title VI, entered into a conciliation agreement with the Authority, and undertook several steps to ensure compliance, including the withholding of UDAG funds from the City. Far from having a discriminatory impact, those actions by HUD have resulted in noticeable progress: not only does the record show that the projects have become increasingly integrated over the past few years, but also the first black member was appointed to the Authority's Board of Commissioners in October 1979. The administrative record also establishes that HUD undertook several Title VI reviews prior to its most recent actions and that each of these effected some progress toward compliance by the Housing Authority.

The plaintiffs would have this Court hold that discriminatory impact is shown merely because HUD did not withhold all financial assistance from THA despite its incomplete compliance with Title VI. By not cutting off funds to the Housing Authority, HUD chose, plaintiffs argue, "to become a partner in the discrimination." (Plaintiffs' Memorandum in Support of Motion for Summary Judgment at p. 2). Plaintiffs' approach ignores not only the administrative record, which shows that HUD was anything but a "partner" in race discrimination, but also the fact that fund termination is a remedy of last resort. Congress itself recognized the severity of the fund cutoff remedy and consequently narrowly defined the circumstances of its use. As Senator Hubert Humphrey, the floor leader of the 1964 civil rights bill, explained:

> [T]he purpose of Title VI is not to cut off funds, but to end racial discrimination ... In general, cutoff of funds would not be consistent with the objectives of the Federal assistance statute if there are available other effective means of ending discrimination ...
>
> [Title VI] encourages Federal departments and agencies to be resourceful in finding ways of ending discrimination voluntarily without forcing a termination of funds needed for ... urgent programs. Cutoff of funds needed for such purposes should be the last step, not the first, in an effective program to end racial discrimination. 110 Cong.Rec. 6544–46 (1964).

Senator Keating also addressed the issue:

> Personally, I think it would be a rare case when funds would be actually cut off. In most cases alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy. If a Negro child were kept out of a school receiving Federal funds, I think it would be better to get the Negro child into school than to cut off funds and impair the education of the white children ...
>
> The withholding of funds would be the last step to be taken only after the ad-

ministrator or the agency had used every possible means to persuade or influence the person or the agency offending to stop the discrimination. 110 Cong.Rec. 7067, 13129 (1964).

In short, "the suspension of federal aid was a sword which Congress cautioned the agencies to wield judiciously; it was envisioned as a weapon of last resort, designed to provide government agencies with leverage in their efforts to secure compliance with the statute." *NAACP v. Wilmington Medical Center*, 453 F.Supp. 280, 293 (D.C. Del.1978), *rev'd on other grounds*, 599 F.2d 1247 (3d Cir. 1979).

Consistent with this Congressional intent, the federal defendants in this case have attempted to secure compliance voluntarily from THA. As is evident from the 1973–1974 documentation in the administrative record, suspension of nonmandatory financial assistance to the Housing Authority itself would have been an extreme, yet futile, measure which would have fallen most heavily on the low income tenants. On the other hand, when HUD saw that fund termination under the newly-enacted UDAG Program was an effective method for securing Title VI compliance in Texarkana, it chose that path. (See, *e.g.*, R. 10–11; 15). The record shows that HUD's prodding of Texarkana to improve its fair housing performance has had a beneficial, not a discriminatory, effect.

In sum, the federal defendants have taken no action with a discriminatory intent or that has had a disparate impact on the plaintiffs. Far from acquiescing, as plaintiffs charge, in THA's racially discriminatory system, HUD has consistently attempted to promote fair housing in Texarkana. The evidence in the administrative record thus does not support the plaintiffs' Title VI claims.

■ The plaintiffs premise their last claim against the federal defendants on section 808(e)(5) of Title VIII, 42 U.S.C. § 3608(d)(5). That section requires HUD's Secretary to administer the agency's "programs and activities relating to housing and urban development in a manner affirma-

tively to further policies of [fair housing]." Although private parties may obtain judicial review of agency action under this section, such review is governed by the Administrative Procedure Act. *Shannon v. HUD*, 436 F.2d 809, 822 (3d Cir. 1970) ("*Shannon*"); *Yarborough v. City of Warren*, 383 F.Supp. 676, 689–690 (E.D. Mich. 1974); *South East Comm. v. HUD*, 343 F.Supp. 62, 65 (N.D. Ill. 1972), *aff'd*, 488 F.2d 1119 (7th Cir. 1973). A court's review is thus narrow and based on the administrative record.

██ In contrast, the language of § 3608(d)(5) is rather broad. But neither it nor the other provisions of Title VIII provide any standards or criteria for determining the particular affirmative activities that the Secretary must implement to meet his statutory obligation to promote fair housing. In essence, it provides no guidance that would permit a reviewing court to make a determination on that question. Implicit in the absence of such standards or criteria is a congressional intent not to circumscribe the Secretary's discretion in this area. Accordingly, while a court may review the efforts of the Secretary to determine whether affirmative action to achieve fair housing was implemented with respect to any HUD program or activity, the particular form or method of affirmative action is committed to the Secretary's discretion. *Yarborough v. City of Warren, supra*, 383 F.Supp. at 689–690; see generally, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

██ Consistent with this analysis, courts have not attempted to delineate HUD's responsibilities under § 3608(d); rather, they have analyzed each case on an *ad hoc* basis to determine whether the agency has undertaken any affirmative action to effectuate fair housing in the challenged activity or program. See, *e.g., Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1017 (E.D. Pa. 1976) ("*Rizzo I*"), *aff'd in part and vacated in part*, 564 F.2d 126 (3d Cir. 1977) ("*Rizzo II*"). For example, it has been held that in approving housing sites, HUD must utilize some institutionalized method to gather the racial data necessary for an informed decision as to whether the proposed site will further integration. *Shannon, supra*, 436 F.2d at 821; *Blackshear Residents' Organization v. Housing Authority of the City of Austin*, 347 F.Supp. 1138, 1148 (W.D. Tex. 1972) ("*Blackshear*"). It has also been held that before approving or funding any housing or urban development project, the agency must ensure that the potential recipient cease any practice that impedes fair housing. *Garrett v. City of Hamtramck*, 335 F.Supp. 16, 27 (E.D. Mich. 1971). Likewise, if it learns that a recipient's activities foster segregation, HUD must use its resources to compel compliance with the policies of Title VIII. This may include termination of federal funds to the recipient's parent municipality. *Rizzo I, supra*, 425 F.Supp. at 1002, n. 28, 1021. See also, *Rizzo II, supra*, 564 F.2d at 137. On the other hand, at least three courts have indicated that in some instances HUD may, because of the overriding importance of factors furthering other national housing goals, continue to fund an activity that is having a segregative effect on the community involved. *South East Chicago Comm. v. HUD*, 488 F.2d 1119, 1128–1129 (7th Cir. 1973); *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973); *Shannon, supra*, 436 F.2d at 822. See also *Croskey v. Romney*, 335 F.Supp. 1251 (E.D.Pa.), *aff'd*, 459 F.2d 109 (3d Cir. 1971). A distinction should thus be drawn between instances where a court finds that HUD has knowingly approved and funded activities that will foster segregation (*e.g., Garrett, supra*, 335 F.Supp. at 27–28; *Blackshear, supra*, 347 F.Supp. at 1147–1148) and those situations where HUD continues to fund existing programs, such as low income housing, that are segregated but are beneficial to the community, especially if HUD is concurrently attempting to discourage segregation by other means. The former might entail a violation of § 3608(d), whereas the latter does not.

Applying these principles to the facts *sub judice*, it is clear that HUD has not violated its duty under § 3608(d). Indeed, the agen-

cy's myriad efforts to promote fair housing through the Texarkana Housing Authority stand in marked contrast to its actions in the two cases relied upon by the plaintiffs. In *Rizzo*, for example, HUD refused to provide assistance to a developer who had sought its help in constructing a low income housing project that the agency had earlier approved for a predominately white neighborhood; instead, the Court found, HUD heeded, "for political reasons," a suggestion to keep a "low profile" in the dispute between the developer and the City of Philadelphia. Whereas, in *Garrett*, the Court found that HUD approved and funded an urban renewal project that the agency knew was devised to foster segregation in the City of Hamtramck.

In Texarkana, however, HUD has taken a series of actions to further the policies of Title VIII. As noted earlier, the agency recently negotiated with THA a conciliation agreement designed to effectuate policies of nondiscrimination. By denying UDAG eligibility to the City of Texarkana, HUD also used its resources to compel civil rights compliance, including fund termination to the parent municipality. In addition, the agency investigated and successfully conciliated a Title VIII complaint from a THA tenant. And even before those most recent actions, HUD undertook several compliance reviews and complaint investigations, all of which achieved some degree of success in promoting fair housing in Texarkana. Thus, when the agency's actions are viewed in their full context, it is quite clear that HUD has taken affirmative steps to promote fair housing in Texarkana. The Secretary has met his duty under Title VIII.

Therefore, judgment should be, and hereby is, entered in favor of the federal defendants, and the Complaint of the plaintiffs is hereby dismissed.

The Court would note that, although finding for the defendants, the plaintiffs and the THA have entered into an agreement designed to guarantee that fair housing will be promoted by the THA, and, of course, the Court expects that HUD will continue its efforts in this regard.